## MOSE OFFITT v. STATE.

No. A-368.    Opinion Filed February 6, 1911.

(113 Pac. 554.)

1. HOMICIDE—Evidence—Admissibility — Threats—Appeal—Harmless Error—Exclusion of Evidence—Subsequent Admission. On the trial of a person on a charge of murder, evidence tending to show that the deceased had made threats against the defendant is competent and should be admitted. when the issue of self-defense is presented. The trial court commits error in refusing to allow such testimony to go to the jury. Such error, however, is cured by the court later, during the trial, allowing the testimony to be introduced.

2. EVIDENCE—Res Gestae—Declarations of Deceased. Statements of the deceased, made prior to his death and immediately. following the shooting, and while deceased is still lying where he was shot, are entitled to be admitted as part of the res gestae, especially when the proof shows that he realized that he was mortally wounded.

3. TRIAL—Waiver of Error—Cross-Examination of Witness. A de-

fendant does not waive his right to urge exceptions on the admissibility of evidence by cross-examination of a witness on the matter objected to.

4. **HOMICIDE—Dying Declarations—Admissibility.** A declaration made by deceased, clearly without premeditation or design, when the record shows he is mortally wounded, and he has made statements showing that he realizes his condition, are properly admitted as dying declarations.

5. **APPEAL—Harmless Error—Instructions.** The giving of a manslaughter instruction on a trial for murder, although erroneous, is not sufficient to justify a reversal of a cause, when the proof shows clearly that the issue of manslaughter was not raised and that the defendant was properly convicted of murder; and the giving of such manslaughter instruction is held to be harmless.

6. **APPEAL—Harmless Error.** When a record although disclosing many errors, shows that the proof is clear, that the defendant was fairly tried and properly convicted, and that the errors complained of are not prejudicial to his rights, the judgment of conviction will be affirmed under the doctrine of harmless error.

(Syllabus by the Court.)

*Appeal from District Court, Pittsburg County; Preslie B. Cole, Judge.*

Mose Offitt was convicted of murder, and he appeals. Affirmed.

*Fuller & Porter,* for appellant.
*Chas. West,* Atty. Gen., for the State.

ARMSTRONG, JUDGE. The indictment in this case charges the appellant, Mose Offitt, with the murder of Bud Ivey, in McAlester, Pittsburg county, Okla., on the 3d day of November, 1908.

The evidence discloses the fact that the appellant and the deceased were both working as waiters, at the Busby Hotel in McAlester during November, 1908. The proof shows that the shooting occurred about 8 o'clock in the evening, and that death, caused by the wound, occurred about 1:30 the following morning. On the lobby floor of the Busby Hotel, the eastern wing was composed at that time of the American plan dining room on the south end, occupying about one-half of the space; the European plan

5 Cr.—4

cafe along the northwest corner, occupying approximately one-eighth of the floor space of the eastern wing; the kitchen and commissary, occupying the remaining space on that floor. The kitchen connects with the dining room and the cafe. From the commissary a stairway ascends into the servants' room or help's hall above, which occupies a space over the kitchen and commissary in the northern half of the eastern wing. The great height of the large American dining room takes up the space south of the help's hall on the level with it; the only entrance to the help's hall is a stairway going down to the commissary. In the center of the servants' room or help's hall is the eating table, surrounded by backless benches. Other benches are around the room in various places, and lockers are in that room, opposite the stairs and beyond the center table, in which the waiters keep their uniforms when off duty and their street clothes when on duty. These lockers seem to be shared by several waiters. They are customarily closed with hinges and padlocks, but if the waiter is a little late and the key to the padlock not at hand, to get in the help frequently knock off the padlocks or hinges, or otherwise force an entrance, and nail the hinges and locks back with staples. To do this nailing an iron scale weight from the commissary below is often used, and was so used shortly before the trouble. The evening meal seems to have begun in both the dining room and the cafe at 6 p. m. each day. The head waiter, Tom Duckett, as appears to have been his custom, about 5:30 p. m. on the afternoon of the killing, went up into the servants' quarters to see if his waiters were preparing for the coming service. It appears that the deceased, Bud Ivey, worked under him and the appellant, Mose Offitt, was not under him, but worked with three or four others in the cafe. Duckett found the deceased, the appellant, and some other waiter in a quarrel over a card game, cursing and unruly. He separated them, finally boxed the ears of the deceased, who was under his discipline, sent him down into the kitchen, and warned the defendant to desist from the quarrel. The defendant, in speaking to Duckett, after Ivey had gone, threatened Ivey and said, "I am going to kill him." This was about half an hour before the

killing. Ivey went into the dining room and shortly after, apparently realizing that he had left some money in the pocket of his street clothes which were in the locker in the servants' quarters, returned to get it. In the meantime Offitt had gone down to the kitchen, and, he claims, was there told that Ivey had gone out to arm himself. The persons whom he claimed gave him this information denied it. He did not go at once to arm himself. He says in his testimony that he knew if Ivey came in he could go to the cafe. He says that he knew that the deceased would have to come in and go to the help's hall or servants' quarters before going to work. He says that he himself went to the servants' hall and armed himself with a Smith & Wesson .38 caliber pistol to protect himself from Ivey, and also says that he expected Ivey might be there when he went there. His exact language being, in response to a question: "No, sir; I wasn't necessarily expecting him, but I prepared myself if anything come up."

One witness, Brown, says:

"When Mose [meaning appellant] came up, he stood a few minutes near the end of the table, then turned back and went to the steps leading down to the commissary below, looked down the steps, took his gun out, and went back to the end of the table. Immediately steps were heard coming up the stairs. Mose stood with a handkerchief over his face watching the steps. Ivey came up and went to his locker."

Appellant denies that he went to the stairs and looked down, watching for the deceased, as stated by the witness above, but admits that after deceased came up he kept his eyes on him. It appears from this record that the appellant directly contradicted every witness in the case on some material point.

The witness Brown, quoted above, says that after deceased arrived in the room and unlocked his locker and hung up his coat, that he got something out of the locker which he put in his pocket, and the appellant walked towards the deceased, saying, "Throw up your hands," pointing a pistol at him, and, "If you don't, I will kill you." The appellant shot, and deceased grabbed the gun, and the appellant shot again. That the deceased fell across the benches after the second shot. That at the command to

raise his hands, the deceased raised his hands to about his waist. That he saw the deceased's hands, and there was nothing in them.

The witness Simmons, who appears to have been another waiter, tells substantially the same story. He says deceased was putting on his jacket at the locker when the appellant went towards him, knocking his (witness') arm (it appears that the witness was standing with his hand up on the wall), and said to the deceased, "Throw up your hands," and appellant shot. That then he (the witness Simmons) got out of the way by going downstairs. ·

It appears from the testimony of the witness Johnson that he was in the servants' quarters, talking to the deceased about going to work, when he first saw the appellant and heard him order the deceased to throw up his hands. He says the deceased didn't move, and, upon the command to throw up his hands, said to the appellant: "What do I want to throw up my hands for?" when the appellant fired the first shot. That the deceased was standing up against his locker, and at the first shot staggered towards the appellant, and at the second shot fell on the table, and witness pulled him on a bench. The deceased didn't fall clear to the floor, but just staggered over on the bench. He is sure that deceased was fixing to go to work, and that he didn't see him move towards the appellant; but that he staggered toward the appellant after the first shot.

The witness Whittaker, who appears to have been another waiter, says that he reached the deceased not over two minutes after the shooting; that the excitement still continued. He says they were "stampeded." That when he reached the deceased he was hollowing, "Put me out; I am burning"; that he asked him (meaning the deceased) how he (meaning the deceased) let him (the appellant) shoot him, and the deceased answered that he could not do anything; he was taking his money out—putting it in his pocket—and before he could do anything he was shot.

The witness Banks, who is a white man and appears to have been the constable, said when he reached the deceased shortly after the shooting that he could not talk much. The deceased said he

was as good as a dead man, and when witness leaned over and asked him how it happened, deceased said he was putting on his jacket when the appellant came in and told him to throw up his hands, and shot. This witness says he found a little money in the deceased's pocket.

Witness Chambers, a colored man, visited the deceased in the hospital after the shooting; said the deceased had no hope of getting well and insisted he couldn't get well, although the witness encouraged him. At that time deceased told the witness how the trouble was, and said: "If I am living in the morning, you come back and I will tell you more about it." It seems that the deceased told witness at that time that in changing some money out of one pocket into another, he noticed this appellant coming up with a pistol, and appellant said, "Throw up your hands, God damn you; I am going to kill you," and was shot immediately. That he hollowed and told the fellow not to shoot him, and said, "You are killing me for nothing," and that appellant was in the act of shooting the second time, when he jumped and grabbed him, to prevent him from shooting any more, and that he shot the second time before deceased could get hold of him.

The appellant denies what these witnesses say; his statement being that when he changed his coat Sam Simmons was up there talking, and went up and placed his hand against the wall and said to deceased, "Come on." And deceased said: "If you are in a hurry, go on downstairs," and reached in his locker, and witness Simmons said, "Don't do that; come on." And when he reached in the locker, appellant noticed his hands, and he put his right hand in his pocket and walked toward him. That he took out his gun and said: "Stop, and throw up your hands." All the other witnesses present deny this statement of the appellant, and he is flatly contradicted by every other witness to the occurrence.

The appellant got away from the scene of the trouble with great speed, was arrested within an hour without his gun, and makes no intelligent explanation of what became of it.

The appellant makes many assignments of error. The first

we shall notice is assignment No. 5, in which he contends that the court erred in refusing to permit the appellant to testify as to what he was informed by one Walker and Simmons relative to the deceased's conduct shortly before the time of the killing. The record does not show what the appellant wanted to state to the court and jury, but, from the statement of counsel made at the time, it was evidently the desire of the appellant to state that he had been informed by the two persons named that deceased had gone off and armed himself, and that he had better be on his guard. This was admissible, and the court should have admitted it; but this error was cured later, the defendant being allowed to testify to those matters.

In another assignment the appellant complains of the court for having permitted the witness Whittaker to testify to certain statements having been made to him by the deceased in the absence of the appellant. The record shows that the deceased was lying there where he was shot; that he had never moved; that it was only a few seconds after the shooting and before being moved from the particular spot; that the deceased, from this evidence, appeared to realize that he was mortally wounded. We think this testimony was entitled to go to the jury. The Attorney General contends that the appellant waived his right to urge this exception because he later cross-examined on this proposition, and thereby re-introduced the same. We do not agree with this contention. The appellant had the right to cross-examine the witness on any material point, and bring out whatever he could for the benefit of his case, without waiving his exception. We do not think that the exception is well taken, however.

In assignment No. 7, the plaintiff in error complains of the court in permitting the witness Banks to testify as to certain conversations and declarations of the deceased after the shooting, in the absence of the appellant, on the theory that they were dying declarations. Appellant contended no proper foundation had been laid. In the case of *Hawkins v. U. S.*, 3 Okla. Cr. 651, 108 Pac. 561, this court said:

"Upon a trial for murder, a declaration made by the deceased,

clearly without premeditation or design, not more than half a minute after the shooting, upon the spot where the shooting occurred, and which declaration tended to explain the main fact, viz., the circumstances of the shooting, is properly a part of the *res gestae,* and is admissible.

The record shows that the deceased had said, "I am a dead man; I am not going to lie to you any more about it," and then he told of the trouble. Record, page 88. In the case of *Hawkins v. U. S.,* cited *supra,* this court held that proof that the deceased was shot one afternoon and died abut 8:30 or 9 o'clock the following morning, that his wound was intensely painful and necessarily fatal, and that he said that he was going to die—shows the conviction in the deceased's mind that death was impending, and is sufficient predicate for the admission of his dying declaration. The record in this case seems to be as strong, if not stronger, than the one in the case of *Hawkins v. U. S.* We therefore conclude that the testimony of the witness Banks was properly admitted.

The complaint of the appellant against the court for permitting the testimony of John Chambers is wholly without merit, as it clearly appears from the record that the deceased at that time realized his hopeless condition, and that he died in a few hours after Chambers talked to him.

The other errors assigned by counsel in their petition and urged in their brief involve the instructions of the trial court. No man could read this record without being overwhelmed with the idea that this appellant is guilty of murder, and, so far as the evidence is concerned, there are no material errors prejudicial to the rights of the appellant in admitting or rejecting it. We think each instruction given is subject to criticism. The principal objections to them, however, are not such as are prejudicial to the interests of the appellant. It appears that these instructions were given under the idea that this offense was to be tried under the laws of Arkansas in force in that portion of the state of Oklahoma formerly known as Indian Territory (prior to statehood), a portion of which comprises Pittsburg county. There is no excuse for the county attorney and the trial court making this mis-

take, but we cannot see that it was harmful to the appellant, however. Murder and manslaughter, under our statute, are easily and clearly defined, and all the propositions raised in this case should have been covered by clear and explicit instructions. The trial judge is not expected to write a treatise on the law of murder and manslaughter in giving instructions to a jury. The instructions should be concise, and so clear that the average layman could understand them.

Counsel for the appellant urges error in the manslaughter instruction and insists his case should be reversed on that ground. If there was any manslaughter in this case, we would be inclined to agree with this contention; but under the proof in this record the appellant was properly convicted of murder, and the fact that an erroneous manslaughter instruction was given could work no injury to the appellant, and whatever error there was in the same, if any, was harmless.

The Attorney General suggests in his brief that, "this being a case of homicide, with self-defense interposed as justification, no reasonable excuse is apparent why the stereotyped instructions of carefully considered cases in the jurisdiction of this or that of other states having the same law were not followed. *People v. Hecker,* 109 Cal. 451, 42 Pac. 307, 30 L. R. A. 403, and many other cases furnish a complete supply suitable for all contingencies. This is too dangerous a matter for experimentation, when the approved course is so plain, and the failure, so far as the record shows, of the prosecuting officer in preparing and furnishing the forms of the Hecker case, or one of similar importance and distinction, should not pass without comment." We hope that the trial courts and prosecuting officers will see to it in the future that their proceedings are not subject to criticisms of this kind. People must be tried according to law. This court is not here to excuse errors, but to correct them, and if there were any proof in this record tending to sustain the contentions of the appellant, this case would have to be reversed.

Upon a careful consideration of the entire record, we feel constrained to say that whatever errors there are work no injustice

upon this appellant, and, under the doctrine of harmless error heretofore announced by this court, the judgment of the lower court is affirmed.                                      )

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.