## C. V. FOSTER v. STATE.

No. A-1105.   Opinion Filed September 30, 1912.

(126 Pac. 835.)

1. HOMICIDE—Documentary Evidence—Declarations—Self-Defense. (a) Where a temporary order of injunction has been issued and served upon a defendant, enjoining him from removing a child beyond the jurisdiction of the court, and requiring him to retain the child within such jurisdiction until the matter can finally be determined, and where an attempt is made to forcibly take such child out of the possession of the defendant, and out of the jurisdiction of the court, before the matter has been finally determined, and the party making this attempt is killed in the difficulty arising therefrom, upon the trial of the defendant for murder on account of such killing, the files and order of the court in such injunction proceedings are admissible in evidence to show the good faith of the defendant.

(b) Where the state introduces the declarations of a defendant in evidence, they cannot arbitrarily select such parts of said statements as are injurious to the defendant and ignore other parts of the same statements which are favorable to him; but the defendant is entitled to have any benefits which may reasonably arise from any part of such statements, unless they are proved to be untrue by other evidence.

(c) Where the issue of self-defense is raised in a murder case, it is competent for the defendant to offer evidence of threats to do him injury, made by the deceased, and hostile demonstrations made toward him by the deceased or others acting with him, whether the defendant was aware of such demonstrations or not.

2. TRIAL — Instructions — Circumstantial Evidence.   In a murder case, where the defendant admits the killing, or where there is direct evidence that the defendant killed the deceased, a charge on circumstantial evidence should not be given.

3. HOMICIDE—Instructions—Applicability to Evidence.   For facts which required the court to instruct the jury upon the law of

kidnapping and the right of a defendant to prevent the commission of this felony, see opinion.

4.    **SAME—Instructions—Self-Defense.** When a defendant is at a place where he has a right to be, and he is unlawfully assailed, it is error to instruct the jury that he should have retreated, before he can avail himself of the right of self-defense.

5.    **TRIAL—Province of Jury—Credibility of Witnesses.** The jury, in the first instance, are the exclusive judges of the credibility of witnesses; and if they find a witness has been successfully impeached, there is no law which requires them to believe him, it matters not how much his evidence may have been corroborated. It is error for the trial court to take this right away from them by its instructions.

(Syllabus by the Court.)

*Appeal from District Court, Jefferson County;*
*Roy Hoffman, Assigned Judge.*

C. V. Foster was convicted of manslaughter in the second degree, and brings error. Reversed.

Appellant, C. V. Foster, and his son, Baker Foster, were jointly prosecuted by information and tried in the district court of Jefferson county for·the offense of murder. Baker Foster was found not guilty by the jury; but appellant, C. V. Foster, was found guilty of manslaughter in the second degree, and his punishment was assessed by the court at confinement in the penitentiary for the period of four years.

The material portions of the evidence in the case are as follows:

S. P. Treadwell testified for the state: That he was sheriff of Jefferson county. That in response to a call he went to the Gan farm, near Grady, and there found a dead man about three-quarters of a mile from the house of appellant, down in the river bottom. That the man was shot in the right rib, and the ball came out about two inches from his spinal column. He was also shot below the collar bone, the ball coming out at the back, and was also shot about an inch above his right eye. Witness arrested appellant and his son, Baker Foster. That appellant said they had had a shooting scrape, and went down into the bottoms and showed witness where the shooting had taken place. That appellant said, when he fired at deceased, he was coming

from the timber at the mouth of the canyon, near a hackberry tree. He said the deceased shot at him first, and then turned and shot at his son, Baker Foster. Appellant said he shot four times.

W. J. Curtis testified, in behalf of the state, that he was deputy sheriff of Jefferson county; that he went to the scene where the homicide occurred; that he had a conversation with appellant and his son with reference to the difficulty. His testimony upon this subject was as follows:

"Q. What else did they say, if anything? A. Well, they said—I asked them who shot first, I think is the way that come up. And they said that Burgett shot first, and I think they said he emptied his shotgun; probably shot at the old man, and then turned at the boy before he shot at him with the shotgun. There was a couple of hulls laying there under the tree there, and I picked them up and asked the old man how they come out there, and he said, 'I throwed them out.' And I said, 'Where is that gun?' and he said he taken it to the house, and I said, 'Why didn't you leave the gun at the tree?' He said he was afraid the fellows would come back and get the gun."

Walter Gan testified for the state: That he resided near the place where the shooting occurred. That he had heard the shooting about noon. That he had heard appellant say that they had had a fight that morning. They said Jess Burgett came and stole the baby, and they had a fight about the baby, in which the baby was shot. Appellant told him he did not know whether deceased was shot or not.

J. H. Brown testified for the state: That he lived in the state of Texas, and about 2½ or 3 miles from the place of the shooting. He went to the place of the shooting and found Jess Burgett dead. He described the wounds on the body of the deceased.

Rube Brown testified for the state: That he resided in the town of Grady. That he went to the scene of the shooting and found the dead body of Jess Burgett. He described the scene of the shooting and the condition of the body.

Gertie May Burgett testified for the state that she resided at Grady, and was the wife of deceased; that she was at the house of appellant the day of the killing; that appellant was her

father; that witness and her husband were separated at the time of the killing; that they had a daughter about three years old; that on the morning of the killing deceased came to the house of the father of witness and got the child; that witness was at work in the field picking cotton with her father and two younger sisters, about 600 yards from the house; that when they received news that deceased had gotten the child they all quit work and went to the house; that appellant went in pursuit of the child.

G. G. Childress testified: That he resided at Cornish, in Jefferson county, and was a huckster. That he was at the house of appellant on the day of the shooting. He went there with his chicken wagon and stopped to collect some money. Appellant came up with some other member of his family and said the baby was shot. Appellant said he was certain he had hit him three times. Appellant said he had captured his gun.

Joe Foster testified: That he was a son of appellant. That he was at the house of appellant when Jess Burgett came to get the child of his sister. That witness saw him as he was leaving the house. Deceased was armed with a shotgun. That appellant was over in the field working, about 600 yards from the house, picking cotton. That witness went to the house and got a gun and tried to stop the deceased, but could not do so. Witness then went and told appellant what had happened. Appellant came on back to the house and followed deceased. Witness told appellant the direction deceased had gone with the child.

J. L. Holloway testified: That he lived about a mile and a half from the place of the killing. That he heard the shooting. That he could not tell exactly where it was, except it was in a southeast direction from where he was at. Something like a dozen shots were fired. First the main shooting came up, and then there was a pause, and then two other shots were fired. There were not over ten seconds between the main shooting and the two shots.

Ed Punneo testified: That he resided at Fox. That he was at the house of appellant on the morning of the shooting, buying

hogs. That he asked them if they had any hogs for sale. They said they did not.

Dr. A. G. Cranfield testified that he was a physician and resided at Grady; that he examined the deceased. He then testified as follows:

"A. I believe I have some notes (witness refers to memorandum) that I can state from better. My memory, since I have been getting a little bit old, may not be so good. I written them off the next day. Mrs. Gan's pasture, where we found Jess Burgett with gunshot wound in his forehead one inch over left eye; exit back part of head; wound made with large caliber gun. One wound in left breast; one in the ninth or tenth intercostal space. I ain't right sure of that, as he had part of his clothes on, and I did not count. Entered in the right side; exit through or near the left kidney; made with a gun of smaller caliber. Inside of right knee, some five shots, supposed to be from a shotgun or small caliber gun in the left leg. His coat, laying under him, contained two shot holes. One in the front, where the ball entered, was badly powder burned, and showed it had been put out. One in the back— Q. What is your opinion —that he died from the effects of the wound? A. My opinion is that he died from the wounding in the (indicating) head; that was the immediate cause of his death."

The state then rested its case.

Appellant offered in evidence the files and order of the court in cause No. 1,678, in the district court of Jefferson county, showing that the deceased had applied for and obtained a temporary injunction against appellant and the wife of the deceased, restraining them from removing their infant child from the jurisdiction of the court until such matter could be finally inquired into, and that the hearing on said injunction was made returnable on the first day of the next term of the court, which was prior to the homicide, and followed this with an offer to prove that the deceased had made several attempts to steal the child at night from the house of appellant, and that deceased's purpose was to get across Red river and get the child into Texas before the injunction suit would be tried; that deceased had threatened to kill appellant, which evidence was by the court excluded, to which appellant excepted.

Appellant then offered W. J. Cooper as a witness in his behalf. He testified: That he lived about three miles east of Grady and about two miles from the house of appellant. That he saw deceased about daylight on the morning of the killing. That deceased had spent the night at the house of witness. Deceased left the house about daylight, and had a shotgun and a six-shooter. Witness heard the shooting about 8 o'clock. It sounded like about thirteen shots were fired. The shooting sounded as if made by two different guns, a big gun and a small gun. That after the main shooting was over witness heard two shots fired, and heard a man hollow.

And thereupon the defendants, by their counsel, offered to prove by the witness W. J. Cooper that about three weeks before the time of the homicide deceased, Burgett, and two other men camped near his house for the night, which point was about a mile from the home of the defendant, and that said parties told said witness that they were going to make an attempt that night to steal the child, over which the difficulty arose, from the home of this defendant; that just before night the two parties that came with the deceased left the camp, saying that they were going to the home of defendant and ask permission to stay all night, and while there steal said child and bring it away from the house and turn it over to said Burgett; that about an hour later the said Burgett left said camp, armed with a shotgun, and told said witness he was going to the home of this defendant to act with said parties in stealing said child, and asked said witness, if he succeeded in stealing said child, would witness assist him that night in crossing Red river into Texas; that on the night before the difficulty, while said Burgett was at his house, he told said witness that he was going over to defendant's house next morning to steal said child, and that if he could ever get a hold of said child he could hold the child in one arm and with his shotgun in the other could mow down the Fosters as fast as they came to him. Which offer to prove was by the court overruled, and to the overruling of which the defendants then and there excepted, and which exception was by the court allowed.

J. C. Cordell testified for appellant: That he resided about a mile from the home of appellant. That he heard the shooting. Between twelve and thirteen shots were fired. They were pistol and gun shots, but he could not tell which was fired first. The shooting was pretty fast. After the main shooting was over, he heard two more shots fired. They appeared to be pistol shots, and were pretty close together.

The appellant offered further to prove by the witness Cordell that on the same night that the three men camped near the home of the witness Cooper, at about 2 o'clock a. m. on said night, the said Jess Burgett came to the home of said witness and called for a drink of water, and while there told said witness that he had been over lying around the home of this defendant, and that three different times that night he had leveled his gun on some man in this defendant's yard, but each time was afraid to shoot, because he was not certain that it was this defendant, and that said Burgett was then armed with a double-barrel shotgun. Which offer was by the court overruled, and to the overruling of which offer the defendants then and there excepted, and which exception was by the court allowed.

Mrs. C. V. Foster testified that she was the wife of appellant; that on the morning of the homicide appellant and her daughter, Mrs. Burgett, with their little girls, were in the cotton patch picking cotton. She further testified: That her sons were in the field gathering corn. John was at the crib throwing corn back. That after breakfast witness was sitting down at the table writing a letter to her mother. That the baby was on the back porch with her little eight year old girl. The little girl ran into the house and informed her that Jess Burgett had gotten Goldie and gone. Witness went in pursuit of him, and called to him to stop and bring the child back. Deceased replied: "Go back! go back! or there will be bloodshed." He was running with the child in his arms. Witness followed as well as she could. Her son Baker and her husband soon joined in the pursuit. Witness kept in sight of deceased until he went into the timber with the baby. Soon afterwards she heard the shooting, but did not see any of it. The shooting was very fast. Witness was very much

unnerved, but kept on as rapidly as she could. She soon met her husband and son Baker coming back. They turned back and started toward the house. After this witness heard two more shots. She knows that neither her husband nor son Baker fired these shots. That she does not know who fired them.

Appellant testified: That on the morning of the killing he was picking cotton with his daughter, when he was informed that the defendant had stolen the child. Appellant was then about three or four hundred yards from the house. Appellant threw his cotton sack down and ran to the house and got his pistol. Appellant saw his wife and went in the direction she was going. Appellant went about 300 yards and met his son Baker on a horse. That Baker told him the direction deceased had gone with the child. Appellant went down the canyon and saw the deceased with the child in his arms, and said to him: "Jess, take Goldie back to her mother." Deceased replied: "You God damn son of a bitch, you done everything you could against me, and, God damn you, I will kill you." Deceased then fired at appellant with his shotgun, and then turned and fired at Baker with the shotgun. He then threw the shotgun down and drew his six-shooter and shot at Baker. At this time appellant began to fire at deceased. He fired four shots at him. When the shooting began, deceased put the baby down. After deceased fired the last shot, he moved off from where the baby was, and appellant picked the baby up and started home with it. As he did so, he looked up and saw the deceased was down on the ground. Baker, the son of appellant, went with him and carried the baby. About 300 yards from the scene of the shooting, they met the wife of deceased, and she said the child was hit by a shot during the shooting. After appellant and his son Baker had left the scene of the shooting, they heard two more shots, but did not know who fired them.

Questions were then asked appellant, for the purpose of showing that he had been informed of previous threats and hostile demonstrations made by deceased against him; but upon objection of the state this evidence was excluded, to which appellant excepted.

Appellant placed a number of witnesses upon the stand to prove that his general reputation in the community in which he resided as a peaceable, quiet, law-abiding citizen was good.

*Jones & Green,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above). First. Every word of the testimony offered by appellant and excluded by the court was competent and material, and should have been admitted. This offered evidence is fully set out in the statement of the case accompanying this opinion, and it is not necessary to restate it here.

The offer to introduce in evidence the files in the injunction proceedings pending against appellant in the district court of Jefferson county should have been received, because under these proceedings it was the duty of appellant to keep the infant child in question within the jurisdiction of the court, and not to allow any person to take it out of such jurisdiction until the matter was finally adjudicated by the court; and in attempting to do this if he acted in good faith, which was a question for the jury to determine, he was simply obeying an order of the court, and was thereby within his legal rights and duty. We cannot understand why the court would not permit appellant to prove that deceased had threatened to kill appellant and other members of his family. We suppose it was upon the theory that the issue of self-defense had not been presented. If this assumption is correct, the ruling of the court was proper; but the state introduced a number of witnesses who testified to statements made by appellant with reference to the fatal difficulty. If these statements had been offered by appellant, they should have been excluded, upon the ground that they were self-serving declarations; but, the state having introduced them in evidence, it could not select such portions as were against appellant and ignore those parts which were favorable to him; and appellant was entitled to any benefits which might reasonably arise from such statements, unless they were proven to be untrue by other evidence, and in these statements appellant said that the deceased

shot at him first. This raised the issue of self-defense, which the jury should decide, under proper instructions from the court. Wherever the issue of self-defense is raised, it is competent for the defendant to offer evidence of threats to do him injury, made by the deceased, and of previous hostile demonstrations toward defendant by the deceased or others acting with him, whether he was aware of such threats or demonstrations or not. Such threats and demonstrations are in no sense of the word hearsay evidence; but they constitute original testimony, and should be received in such case and considered by the jury for what they are worth. In *Offitt v. State*, 5 Okla. Cr. 48, 113 Pac. 554, Judge Armstrong, speaking for the court, said:

"On a trial of a person charged with murder, evidence tending to show that the deceased had made threats against the appellant is competent, and should be admitted when the issue of self-defense is presented."

See, also, *White v. State*, 4 Okla. Cr. 143, 111 Pac. 1010, and *Saunders v. State*, 4 Okla. Cr. 264, 111 Pac. 965, Ann. Cas. 1912B, 766. For a full discussion of the philosophy of the law of threats, see *Morris v. Territory*, 1 Okla. Cr. 624, 99 Pac. 760, 101 Pac. 111. It would be well for all trial judges in Oklahoma to make themselves familiar with what is there said, because it represents the mature views of this court, and will be followed as a precedent. If this case is ever tried again, all of the evidence offered will be material and competent, and should be admitted.

Second. Exceptions were reserved to the instructions of the court upon the subject of circumstantial evidence; but it would be a waste of time to discuss this kind of testimony here, because this is in no sense of the word a case of circumstantial evidence. Where a defendant admits the killing, or where there is any direct evidence that the defendant did kill the deceased, a charge on circumstantial evidence should not be given. We do not deem it necessary to discuss the accuracy of the instructions given in this case, as the case will have to be reversed upon other grounds, and as the error complained of cannot possibly occur upon a second trial, because no instruction upon this subject should be given.

Third. Section 2300, Comp. Laws 1909, is as follows:

"Every person who, without lawful authority, forcibly seizes and confines another, or inveigles or kidnaps another, with intent, either: 1st. To cause such other person to be secretly confined or imprisoned in this state against his will; or, 2nd. To cause such other person to be sent out of this state against his will; or, 3rd. To cause such person to be sold as a slave, or in any way held to service against his will, is punishable by imprisonment in the state prison not exceeding ten years. Upon any trial for a violation of this section, the consent thereto of the person kidnapped or confined, shall not be a defense, unless it appears satisfactorily to the jury, that such person was above the age of twelve years, and that such consent was not extorted by threat, or by duress."

Section 2290, Comp. Laws 1909, is as follows:

"Homicide is also justifiable when committed by any person in either of the following cases: 1. When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is; or, 2. When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; or, 3. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot; or in lawfully keeping and preserving the peace."

Under the order of the court in the injunction case, it was the duty of appellant to prevent the baby from being carried beyond the jurisdiction of the court until the matter was finally determined. As the baby was under twelve years of age, the attempt upon the part of the deceased to carry the baby into the state of Texas, under the evidence in this case, constituted kidnapping, although the baby may have gone with him of its own free will and accord. When appellant was informed of the attempt to kidnap the baby, it was his right and duty to use all necessary means to prevent this from being done. If appellant was informed that deceased was armed with a shotgun, and had been informed of the previous threats and hostile demon-

strations of deceased, appellant had the right to arm himself and pursue deceased to prevent him from carrying his illegal purpose into execution; and if appellant acted in good faith and had reasonable ground to believe that there was imminent danger that deceased would kidnap the child, under section 2290 hereinbefore quoted, appellant had the right to use all reasonable, necessary, or apparently necessary, means in his power to prevent the commission of this felony. This is the plain statute law of the state, and it is not open for discussion; and the court, by proper instructions, should have submitted this question to the jury and allowed them to pass upon the good faith of appellant. We find no such instruction in the record.

Fourth. Among other things, the court instructed the jury as follows:

"If the jury find from the evidence that the conduct of Burgett at the time of the homicide was such as to reasonable lead the defendants to believe that Burgett was about to inflict some great bodily harm upon their persons, and the jury further find that the defendants were not at fault in bringing on the difficulty, and that the defendants could not have retreated without increasing their danger, and that the defendants acted upon such reasonable belief of great bodily harm being done them at the hands of the deceased, Burgett, then the jury should acquit the defendants."

The portion of the instruction which required the jury to find that the appellant should have retreated before he could act in self-defense is not the law, and should not have been given. This instruction has been repeatedly condemned. See *Price v. State,* 1 Okla. Cr. 384, 98 Pac. 447; *Floyd v. State,* 5 Okla. Cr. 65, 113 Pac. 212; *Fowler v. State, ante,* 126 Pac. 831, decided at the present term.

As was said by this court in the case of *Fowler v. State, supra*:

"Under the old common law, no man could defend himself until he had retreated, and until his back was to the wall; but this is not the law in free America. Here the wall is to every man's back. It is the wall of his rights; and when he is at a place where he has a right to be, and he is unlawfully assailed, he may stand and defend himself; and cases sometimes arise in

which he has the right, when unlawfully assailed, to advance and defend himself until he finds himself out of danger."

Fifth. Among other things, the court instructed the jury as follows:

"And in the event you find that any witness has willfully testified falsely relative to any material matter in issue you are at liberty to disregard the whole of such witness' testimony, except in so far as the same may be corroborated by other credible witnesses, or by some other facts and circumstances appearing upon the trial."

This instruction has been so often condemned by this court that it is needless to cite the cases in which this has been done, as every one who has paid the least attention to what has been decided is already familiar with the law upon this subject. We cannot understand why trial judges disregard what has been decided. They should know that by doing so they are simply inviting a reversal of their judgments, as it would be folly for this court not to enforce its decisions. The practice must be uniform in the state. The effect of the latter clause given was to take away from the jury the right to judge of the credibility of the witnesses. If the jury find that any witness has been successfully impeached in any manner, they are not bound to believe him, because he has been corroborated, as this instruction would require them to do.

There are a number of other errors assigned which it is needless to discuss, because we think that what has already been decided is decisive of the case if it is ever tried again.

The judgment of the lower court is therefore reversed.

ARMSTRONG and DOYLE, JJ., concur.