William Lawson HOUCK, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–905.

Court of Criminal Appeals of Oklahoma.

April 27, 1977.

Pete Silva, Jr., Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Michael Cauthron, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, William Lawson Houck, hereinafter referred to as the defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–76–631, for the offense of Murder in the Second Degree in violation of 21 O.S.Supp.1973, § 701.2. His sentence was fixed at an indeterminate term of ten (10) years to life imprisonment in accordance with the statute. From said judgment and sentence, an appeal has been filed with this Court.

From the testimony and evidence presented at trial, the State's case was as follows. On March 8, 1976, the victim, Theodore Leon Duke, was a resident of the Cotton Hotel, 514½ Main Street, Tulsa. In the mid-afternoon, Duke gave Opal May Ryan, the hotel manager, a $50.00 bill to pay his room rent of $43.68. Mrs. Ryan gave Duke his change, which she saw him place in his billfold, with a receipt. The defendant who was a "houseman" at the hotel, witnessed the exchange.

Duke appeared to be intoxicated. He went into the hotel lobby and sat on a couch, from which he slid off. Mrs. Ryan asked Clint E. Brumley, a resident of the hotel, to help Duke to his room, which was located down a hall from the lobby. Duke was unable to walk or to stand up by himself. Brumley left Duke sitting on the edge of his bed. The door to Duke's room was unlocked when Brumley left.

The defendant, whose duties at the hotel included cleaning the rooms and caring for the beds, had a master key which he checked out and in from Mrs. Ryan's office. On March 8, 1976, he finished his chores in the late afternoon. He prepared supper for Mrs. Ryan and himself in her kitchen and spent the evening with her watching television, leaving her room at approximately 10:00 p.m. Mrs. Ryan did not notice any blood on the defendant's clothing or bruises on his hands during the evening.

Mrs. Ryan described the defendant as "extremely nervous." When people in his presence got into an argument, "he would try to smooth it over," she said. No one at the hotel had ever complained to her about the defendant's work, or had reported anything missing from a room, she added.

On March 9, 1976, the defendant kept a doctor's appointment, which Mrs. Ryan had arranged for him, concerning his nervous condition. He returned to the hotel at approximately 10:30 a.m. and resumed his duties. Between 11:30 a.m. and noon, the defendant came into the hotel lobby and asked Arthur A. Gustafson, a hotel resident, to come to Duke's room because Duke was sick.

When the defendant opened the door to Duke's room, the two men discovered it was hot inside. The defendant immediately went over to the heater and shut it off. Duke was lying on his back across the bed. Blood was visible on Duke's face and shirt, and on the bedding around him. A white cloth was around his neck. The defendant touched Duke and told Gustafson he thought there was a faint heartbeat. Gustafson stepped into the room and looked at Duke, but was unable to detect any signs of breathing.

The defendant and Gustafson returned to the manager's office. An ambulance was called.

Dr. Robert Fogel, a forensic pathologist, performed an autopsy on the victim's body at approximately 4:00 p.m. on March 9, 1976. He removed "a pillowcase which was wrapped around (the victim's) neck, tightly, so that one could hardly put a finger beneath the knot and the pillowcase . ." The victim also had multiple contusions and lacerations about his face and the right side of his head, and on his chest. There was 0.32% alcohol in the victim's blood.

Fogel estimated the victim had died between 4:00 p.m. on March 8th and 4:00 a.m.

on March 9th. He fixed the cause of death as strangulation, which would have taken from one to two minutes to effectuate using the pillowcase. Fogel added that "If it hadn't been for the strangulation, it's conceivable that (the victim) would have died as a result of the brain injury . . ."

Tulsa Police Detective Charles Sasser arrived at the hotel at approximately 1:20 p.m. on March 9th. Sasser observed the victim and the condition of his room. He discovered the remains of a homemade cigarette on the floor near the bed. He found indications that the victim smoked; there was a partially filled package of cigarettes in a bureau drawer. The receipt Mrs. Ryan had given the victim for his rent payment was found on or by the bed. The victim's billfold and money were not found.

Sasser questioned the defendant at the homicide scene. He saw a can of tobacco and cigarette papers in the defendant's shirt pocket. Sasser considered the defendant a witness and sent him to the police station to have his statement taken.

Tulsa Police Senior Investigator Larry Johnson advised the defendant of his Miranda rights at approximately 3:00 p.m. on March 9th. After the defendant had signed a written waiver of those rights, Johnson and other officers interviewed him. The defendant signed a statement admitting that he had gone to the victim's room at approximately 4:30 p.m. on March 8th. The victim "got up and said did I (the defendant) want to go a round or two, and I said no not to day [sic]. He (the victim) got up and swung at me and I hit him. I slapped him, up the side of the face and then I backed out of the door." [1]

The officers continued questioning the defendant after he made the above statement because it did not correspond to the physical evidence they had in connection with the homicide. Approximately 20 minutes after he signed the first statement, the defendant made and signed a second statement in which he admitted fighting with the victim. He became so angered that he lost control of himself. He "vaguely" remembered strangling the victim with the pillowcase. He contended, however, that he acted in self-defense. [2]

Tulsa Police Detective Jack Powell observed on March 9th that both of the defendant's hands "were discolored, slightly bruised, the right hand more so than the left."

Various witnesses identified State's Exhibits Nos. 1–5 as black and white photographs of what they saw at the homicide scene on March 8th.

The defendant's testimony of the events prior to his alleged statements at the police station generally conforms to the testimony of the State's witnesses, except that he contended the victim had paid his rent on March 7, 1976, not March 8th.

The defendant denied, however, that he had ever struck the victim or was in any way responsible for the death. He claimed that certain officers had threatened him

---

1. State's Exhibit No. 6, at 1.

2. "Q. Mr. Houck, will you please explain to me what these additional details are?
   "A. When I entered his room, (the victim) swung at me and I slapped him two or three times. He came towards me and I sat him down on the bed and he started swinging at me again. I guess I went crazy. That's about the size of it. I vaguley [sic] remember reaching up on a towel rack and getting a piece of cloth of some kind and putting it around Mr. Duke's neck. We were still on the bed and I got up and backed out of the door.
   "Q. Mr. Houck, are you telling me that due to Mr. Duke's fighting you that you became so angry that you really lost control of yourself?
   "A. Yes sir, tha's the way I would put it.
   "Q. Mr. Houck, have you had problems with your nerves before?
   "A. All my life.
   "Q. Have you ever lost your temper to this point before?
   "A. No sir, not that I recall. This is the worst I ever recall (losing) my temper.
   "Q. Mr. Houck, do you believe, at this time, your actions and the fight between you and Mr. Duke yesterday, caused Mr. Duke's death?
   "A. I didn't mean to kill the man, but I realize what I did cause his death. I feel like I was acting in self-defense." *Id.,* at 3.

with physical abuse if he did not confess, but admitted he had not been harmed. He remembered talking with police officers and signing the rights waiver card, but could not recall having admitted fighting with the victim or killing him. He identified his signature at various places on the statement introduced as State's Exhibit No. 6, but could not recall having signed it.

## I.

█ In his combined first and second assignments of error defendant contends that the State introduced and used his confession to establish· the corpus delicti of second-degree murder. He argues that by using the confession, the State was bound by the total document. When the confession is considered as a whole, defendant contends it conclusively establishes that the most of which he could be guilty is first-degree manslaughter.

Defendant cites *Foster v. State,* 8 Okl.Cr. 139, 126 P. 835 (1912), as authority for his proposition that the State must be bound by the total confession or it cannot use the confession. In Section 1(b) of the syllabus of the *Foster* case this Court stated:

"Where the state introduces the declarations of a defendant in evidence, it cannot arbitrarily select such parts of said statements as are *injurious to the defendant* and ignore other parts of the same statements which are favorable to him; but the defendant is entitled to have any benefits which may reasonably arise from any part of such statements, *unless they are proved .to be untrue by other evidence.*" (Emphasis added).

In the case at bar, the State introduced sufficient circumstantial evidence to rebut the self-serving parts of defendant's declaration, creating an inference which supports his second-degree murder conviction. As an example, the testimony by Fogel that it

took between one and two minutes for the victim to die as a result of strangulation is sufficient to raise an inference of premeditation.[3]

In addition, the fact that the victim's money and billfold were missing is sufficient to raise an inference that the victim died during robbery by force or fear.[4] Defendant's first proposition in support of his first and second assignments of error is without merit.

██ Defendant's second proposition is that without his confession, the State cannot establish the *corpus delicti* of second-degree murder. Premeditation may be implied from the use of an instrument in such a manner as naturally and probably to cause death; *Gatewood v. State,* 80 Okl.Cr. 135, 157 P.2d 473 (1945), such as in the instant case where a pillow case was found wrapped tightly around the deceased's neck and a doctor testified this strangulation was the cause of death.

█ The defendant's confession, under the facts in the case at bar, was needed to link him to the crime, but the specific identity of the assailant is not part of the *corpus delicti* of the crime charged. Defendant's second proposition in support of his first and second assignments of error is without merit.

## II.

█ The defendant's next assignment of error is that the trial court erred in admitting defendant's alleged statement into evidence. We believe the trial court's remarks together with the evidence above set forth, amply deal with this contention. After the circumstances under which the defendant's statements were made and the contents of the statements were testified to by the witness, the State completed its direct examination of the witness and the defendant

---

**3.** Under 21 O.S.Supp.1973, § 701.2(1), homicide is murder in the second degree when it is "perpetrated without authority of law, and with a premeditated design to effect the death of a person, . . . but by an act not enumerated in" Section 701.1(1–10).

**4.** Under Section 701.2(3), homicide is murder in the second degree when it is "perpetrated without any design to effect death by a person engaged in the commission of any felony other than the felonious acts set out in Section 1 . . . ."

moved to suppress the statements and moved for a mistrial whereupon the court stated as follows:

"THE COURT: With regard to the motion to suppress, the court notes and observes that at no time did counsel for the defendant request an evidentiary hearing or seek to make further inquiry with regard to a predicate laid by the State herein. The Court notes and observes that the inquiry was made without objection. The Court also notes and observes that this witness did áttest to the fact that the defendant knew or indicated that he knew and understood his rights; that he did make the statements freely and voluntarily. Certainly, this witness is competent to attest to the fact that the defendant signed a rights waiver, as the witness testified that the same was executed in his presence, as well as in the presence of Officers Powell and Hanks. The defendant is at perfect liberty to inquire further with regard to the voluntariness of the execution of the rights waiver. However, at this time, the motion to suppress will be overruled, with exception; motion for mistrial will be overruled, with exception."

The defendant's third assignment of error is without merit.

### III.

■ The defendant next contends that the trial court erred in failing to give an instruction on manslaughter in the first-degree. The State in its reply argues that it was not error to fail to give such an instruc-

tion since the defendant did not request one.

Apparently neither party made the effort to examine the record, for even the most cursory examination clearly establishes that the trial court gave three instructions covering first-degree manslaughter together with a jury verdict for manslaughter in the first-degree. This assignment of error is not supported by the record.

### IV.

■ As his final assignment of error, defendant contends that his mandatory indeterminate sentence of ten (10) years to life imprisonment is cruel and unusual punishment, and relies on *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Green v. Oklahoma,* 428 U.S. 907, 96 S.Ct. 3216, 49 L.Ed.2d 1214 (1976), and *Justus v. Oklahoma,* 428 U.S. 907, 96 S.Ct. 3216, 49 L.Ed.2d 1214 (1976). These cases do not support defendant's assertion and we are of the opinion that his final assignment of error is without merit.

For all the above and foregoing reasons, the judgment and sentence appealed from is *AFFIRMED.*

BLISS and BRETT, JJ., concur.