ANDREW McDANIEL, *et al.* v. STATE.

No. A-1178.    Opinion Filed October 26, 1912.

(127 Pac. 358.)

1.    INDICTMENT AND INFORMATION—Preliminary Examination
—Joint Indictment—Objections to Information. (a) In an infor-
mation for a felony, it is not necessary to allege that the defend-
has had a preliminary examination before an examining magistrate,
or that he has waived such preliminary examination.

(b) If as a matter of fact there has not been a preliminary
examination before an examining magistrate, or a waiver thereof,
and a defendant desires to offer this as an objection to an infor-
mation against him for a felony, he must set up by plea in abate-
ment that such examining trial has not been had or waived by
him.

(c) Where two or more persons are joined together in an in-
formation or indictment charged with the commission of a felony,
and it is alleged that they acted together and with each other in the
commission of such felony, it is not necessary that such informa-
tion or indictment should go further, and state the facts showing
how such parties acted together.

(d) Where an objection to an information is presented for
the first time upon a motion to exclude testimony, the motion
should be overruled if by any intendment or presumption the in-
formation can be sustained.

2.    HOMICIDE—Evidence—Threats.    The modern rule is to admit
generic threats or threats directed toward a class, and leave their
weight for the jury.

3.    WITNESSES—Cross-Examination—Impeachment.    Where a wit-
ness has testified on cross-examination for the purpose of affecting
his credibility that he has been convicted of a felony, the state
may go further, and require said witness to state of what felony
he has been convicted, because different felonies indicate different
degrees of infamy.

4.    APPEAL—Reversal.    Where a defendant or defendants have been
properly charged and fairly tried and convicted and proven to be
guilty of an offense, a conviction will not be reversed upon light
and trivial grounds, but a new trial will only be granted where
the record shows that he or they was or were deprived of some
substantial right, to his or their injury.

5.    HOMICIDE—Instructions—Sufficiency.    For approved instructions
on the subject of murder, manslaughter, self-defense, threats, and
voluntary mutual combat, see statement of case.

(Syllabus by the Court.)

*Appeal from District Court, Pushmataha County;*
*Malcolm E. Rosser, Judge.*

Andrew McDaniel and another were convicted of murder, and appeal. Affirmed.

The information in this case was as follows:

"In the name and by the authority of the state of Oklahoma, now comes A. J. Arnote, the duly qualified and acting county attorney in and for Pushmataha county, state of Oklahoma, and gives the district court of Pushmataha county, state of Oklahoma, to know and be informed that Andrew McDaniel and Joe McDaniel did in Pushmataha county, and in the state of Oklahoma, on or about the 16th day of November in the year of our Lord one thousand nine hundred and ten and anterior to the presentment hereof, commit the crime of murder in the manner and form as follows, to wit: The said Andrew McDaniel and Joe McDaniel, acting together, did then and there feloniously, without authority of law and with a premeditated design to effect the death of one W. M. Smith, shoot and discharge leaden bullets into the body of him, the said W. M. Smith, from a certain loaded shotgun which the said Andrew McDaniel then and there had and held in his hands, then and there and thereby inflicting upon the body of him, the said W. M. Smith, two mortal wounds, of which he, the said W. M. Smith, then and there on the sixteenth day of November, 1910, did die. That the said Andrew McDaniel and Joe McDaniel, in the manner and form aforesaid, did kill and murder the said W. M. Smith, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the state."

Something like 30 witnesses testified upon the trial of this case. Their testimony covers several hundred pages. It would take up too much space to state the testimony in full, but we have made a condensed statement of the testimony in narrative form, and we think that the material facts are as follows:

The appellants, Andrew and Joe McDaniel, and also the deceased, were, or had been, residents of Pushmataha county, and at some time during their residence had lived neighbors. It appears from the record that a short time before this killing took place Henry McDaniel, the brother of appellants, had been prosecuted by the deceased, W. M. Smith, for stealing some of his property, and that out of that prosecution a certain ill feeling

grew up on the part of these appellants against the deceased, Smith, and this ill feeling is evidenced by certain threats that appear of record as having been made on the part of both Andy and Joe McDaniel. This killing took place in the town of Antlers, and at a time when the deceased was in front of what was known as the Spruell or Commercial Hotel in that town. The main street of the town runs east and west by this hotel, which is on the north side of the street. The Frisco depot is west of the hotel about 59 or 60 yards; the main part of the town of Antlers being east of the hotel. Andy and Joe McDaniel had been down to the Frisco depot along about 2 o'clock of the afternoon of the day of the killing, and were coming back uptown, for what purpose it does not clearly appear from the record. In going uptown they had to pass by or did pass by the Spruell Hotel, which had a balcony that extends out over the sidewalk. The deceased, together with George and Eugene Stephenson and a man by the name of Wick Smith, were all out in front of this hotel, sitting on the rail of this balcony when the appellants approached. Joe McDaniel shook hands with George Stephenson, and then extended his hand toward Eugene Stephenson. . The deceased, thinking that he intended to shake hands with him, extended his hand to shake hands with Joe McDaniel, when Joe McDaniel became incensed, and told him not to stick his paw out to shake hands with him. Whereupon the deceased withdrew his hand, and made a motion back of him, the witness says, as if to take hold of a pistol, at the same time remarking to Joe McDaniel that he was not ashamed of anything he had done. It appears that Andrew McDaniel at this time did not stop; but in his testimony he says that he heard the conversation between Joe McDaniel and the deceased, Smith. As soon as the remarks were made as above set forth, Joe McDaniel started on east towards town, and he and Andrew stopped in a poolhall about 60 or 70 feet east of the Spruell Hotel and Andrew asked the man in charge, by the name of Baker, and also the proprietor by the name of Belcher, to let him have a pistol, and they each refused to do so. Whereupon they left and started on up the street, Andrew going on to a wagon that

was in town which he claims was his father's wagon, and out of it he procured a double-barreled shot gun (breach loading, hammerless, No. 12 gauge). This gun was loaded with buckshot. Immediately thereafter he got with his brother Joe, and they started, as they claim, toward the Frisco depot, where Andrew says he intended to take the train south. Several witnesses in rebuttal testified that the train south had already pulled out, or was pulling out at the time this shooting occurred. Therefore it would have been impossible for them to have taken the train out that afternoon. At any rate, they started back to the place where the previous difficulty had been had with the deceased, W. M. Smith. Andrew was carrying the shotgun under his arm, and was walking along on the north side of the sidewalk. Joe, who claims that he was unarmed, was walking by his side. As to what occurred when they got up to where the deceased was there is a dispute. The witnesses for the state, Eugene Stephenson, sheriff of the county, and Wick Smith, who was not a relative of the deceased and a total stranger to appellants, testified that Andrew McDaniel said: "Now do what you are going to do, or do what you intended to do." And then when he said that the deceased, Smith, started to reach for a gun, and the witness Wick Smith grabbed him, while the witness Eugene Stephenson started toward Andrew McDaniel, and took hold of his arm to prevent him from shooting. In the scuffle that followed W. M. Smith broke loose from Wick Smith, and fired a pistol in the direction of Joe McDaniel, and almost simultaneously therewith Andrew McDaniel shot him twice with a shotgun, inflicting two mortal wounds; one in the left breast and the other just about the right hip. The latter was inflicted after Smith fell to the ground. The defendants contend that they did not get the shotgun for the purpose of having a difficulty with deceased, but that they intended to go on by him and have no trouble with him, and that Andrew was taking the shotgun with him on the train; that, when they got even with Smith, Smith spoke up and said, "I am ready for you now," or some similar expression, and started to pull a gun, and had a gun out and shot one shot at

Joe McDaniel before Andrew fired the shot, and that the shots that he did fire were in defense of his brother Joe and of himself.

If the theory of the state was true, that Andrew and Joe McDaniel became incensed at the conduct of Smith in the first instance in attempting to draw his pistol and immediately left the scene with the intention of going and arming themselves, and then returned for the purpose of having a difficulty with Smith in which deadly weapons should be used, then both defendants were guilty of murder. On the other hand, if the theory of the defense is true, that they intended no such difficulty, that the trouble with the deceased, Smith, was over immediately after they left the scene on the first occasion, that thy were on a peaceable mission to take the train to leave the town and were assaulted by Smith in such manner as to lead them to believe that their lives were in danger, or that they were in imminent danger of great bodily harm, then neither of them would be guilty, because they were acting in their lawful self-defense. There is evidence to show that from the time the McDaniel boys left the deceased in the first instance until the time they got back there and the difficulty started they were acting together in procuring a gun, and that their common purpose was to wreak vengeance upon deceased.

The court instructed the jury as follows:

"The defendants, Andrew McDaniel and Joe McDaniel, are charged in the information in this case with the crime of murder. The information alleges that the defendants, in Pushmataha county, and state of Oklahoma, feloniously, without authority of law and with premeditated design to effect the death of one W. M. Smith, shot the said W. M. Smith with a certain loaded shotgun, which Andrew McDaniel had and held in his hands, thereby inflicting upon the said Smith a mortal wound of which he died; that the shooting occurred on the 16th day of November, A. D. 1910, and that Smith died on the same day, and it alleges that by reason of the facts stated the defendants are guilty of murder. In addition to the charge of murder, the information contains and charges a lesser degree of felonious homicide known as manslaughter. To this charge contained in the information the defendants have pleaded not guilty, and you are now impaneled and sworn to try the question of their guilt or innocence.

"(2) All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or only aid and abet its commission, are principals in the offense and equally guilty.

"(3) To aid and abet may consist of words spoken, or acts done for the purpose of assisting in the commission of a crime or of encouraging its commission.

"(4) Homicide is the killing of one human being by another. Homicide is either murder, manslaughter in the first degree, manslaughter in the second degree, excusable homicide, or justifiable homicide. You are instructed that there is no evidence in this case showing, or tending to show, that the homicide in this case is manslaughter in the second degree, and that degree of homicide will not be defined to you, further than to say that it is certain kinds of negligent, but unintentional, killings. You are further instructed that there is no evidence in this case showing, or tending to show, that the homicide in this case was excusable homicide, and that degree of homicide will not be defined to you further than to say that it is a certain kind of accidental killings.

"(5) Homicide is murder when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of some other human being.

"(6) A design to effect death is premeditated, within the meaning of the law, if the intention to take life is deliberately formed in the mind before the act is done which results in death no matter for how short a time. It may be formed instantly before committing the act by which it is carried into execution.

"(7) Homicide is manslaughter in the first degree, when perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"(8) Both murder and manslaughter are unlawful killings. The distinction is that in murder there is a premeditated design to effect death; in manslaughter there is no premeditated design. If there is a premeditated design to effect death, homicide is murder, no matter how angry the slayer may be at the time of the homicide.

"(9) In this case the defendant Andrew McDaniel as his plea and for his defense says that homicide was justifiable, and that in taking the life of the deceased he was acting in the defense of his brother. The defendant Joe McDaniel for his defense claims that the act of Andrew McDaniel was justified, and that

he, Joe McDaniel, took no part in the transaction, and did not engage in the difficulty in any way.

"(10) Homicide is justifiable when committed by any person in resisting any attempt to murder such person or to commit any felony upon him, or upon or in any dwelling house in which such person is; and it is also justifiable when committed in the lawful defense of such person, or wife, parent, child, master, mistress, or servant, brother or sister when there is reasonable grounds to apprehend a design to commit a felony, or to do some great personal injury and imminent danger of such design being accomplished.

"(11) The law gives to every person the right to fight in his self-defense to protect himself from the unlawful attacks of his adversary, and, if necessary to save his life or prevent great bodily injury, he may take the life of his assailant, and, where a person is unlawfully attacked, he is not required to retreat, but has the right to stand his ground and to use whatever force is necessary to repel the attack, even to the extent of taking life, and is not required to desist or cease from use of force until his adversary has entirely abandoned the conflict or has been disabled, and he has the same right to act in the defense of his brother as in his own defense.

"(12) The law of self-defense is given to the citizen for his protection, and it cannot be pleaded as a defense by one who himself is the aggressor, or who enters voluntarily into a difficulty armed with a deadly weapon, no matter in how much danger he may be placed in the course of the difficulty, nor how imminent his peril may become.

"(13) Now in this case, if you believe from the evidence beyond a reasonable doubt that the defendant Andrew McDaniel shot and killed the deceased, W. M. Smith, in Pushmataha county, and state of Oklahoma, at any time since the 16th day of November, 1907, and that the shooting was with the premeditated design to effect the death of the said W. M. Smith, and without difficulty [authority] of law, and that the defendant Joe McDaniel was concerned in the shooting, and aided and abetted or encouraged Andrew McDaniel to shoot the deceased, W. M. Smith, and with a premeditated design that his death should thereby be effected, then it would be your duty to convict both the defendants of murder. But if you believe from the evidence beyond a reasonable doubt that the defendant Andrew McDaniel shot the deceased, W. M. Smith, with the premeditated design to effect his death and without authority of law, but do not believe from the evidence beyond a reasonable doubt that the de-

fendant Joe McDaniel was concerned in the shooting and aided and abetted or encouraged Andrew McDaniel to shoot the deceased, then it will be your duty to convict the defendant Andrew McDaniel, and acquit the defendant Joe McDaniel. If you convict the defendants, or one of them for murder, you will assess the punishment on them or him at death, or imprisonment for life, at your discretion.

"(14) If you do not believe beyond a reasonable doubt that the defendants or either of them are guilty of murder, but believe from the evidence beyond a reasonable doubt that the defendant Andrew McDaniel shot the deceased, W. M. Smith, while in a heat of passion, and without premeditated design to effect his death, then it will be your duty to convict the defendant Andrew McDaniel of manslaughter in the first degree, unless you shall find the shooting was justifiable. If you convict the defendant Andrew McDaniel of manslaughter, you will assess his punishment at imprisonment for any time not less than four years.

"(15) If you believe from the evidence or have a reasonable doubt as to the fact that it reasonably appeared to the defendant Andrew McDaniel situated as he then was and that he honestly believed that his brother, Joe McDaniel or himself, was in imminent danger of losing his life or receiving great bodily injury, and that he fired the shot to protect his brother from the threatened danger, then the shooting would be a lawful one, and it would be your duty to acquit the defendants, unless you shall believe from the evidence beyond a reasonable doubt that they entered voluntarily into the difficulty, one of them armed with a deadly weapon at the time.

"(16) If you believe from the evidence beyond a reasonable doubt that, after the first meeting with the deceased in front of the hotel that the defendant Andrew McDaniel armed himself with a shotgun, and that the defendants, in pursuance of a common design to engage in a deadly conflict with the deceased, returned to the place where the deceased was, and then and there voluntarily entered into the difficulty in which the deceased lost his life, they are both guilty of murder, and it will be your duty to convict them of that charge, no matter in how much danger or peril they may have been at the time of the homicide.

"(17) If you believe from the evidence beyond a reasonable doubt that, after the first meeting with the deceased, the defendant Andrew McDaniel armed himself with a shotgun and returned to the place where the deceased was for the purpose of engaging deceased in a deadly conflict, and then and there volun-

tarily entered into the difficulty, but do not believe beyond a reasonable doubt that the defendant Joe McDaniel had such purpose, or aided, encouraged, or abetted Andrew McDaniel in such purpose, then it will be your duty to convict the defendant Andrew McDaniel of murder and to acquit the defendant Joe Mc-Daniel.

"(18)  If the defendant Andrew McDaniel secured the shotgun and started back towards the station without any intent of engaging in a conflict with the deceased, or without any purpose or desire to do so, or either he or his brother were assaulted by the deceased in such a way as reasonably caused him to believe that he or his brother were in danger of losing his life, or receiving great bodily injury, then the homicide in this case is justifiable, and it will be your duty to acquit the defendants, and that would be true, even though at the time the defendant Andrew McDaniel started towards the station he may have feared an attack from the deceased, and may have intended to use the gun to protect himself or his brother should the deceased make a deadly assault upon him.

"(19)  The state of mind of the defendants at the time they started towards the station with the gun is the principal question in this case.  If they started back with the hope or expectation that there would be trouble, and intending willingly to enter into the trouble, and to take the life of the deceased if opportunity offered, and voluntarily entered into the difficulty, then they, or the one of them, having that intention, and so entering into the conflict, are guilty of murder; but if they had no such hope as they started back, but, on the contrary, hoped and desired that there would be no trouble, and with the expectation of using the weapon with which Andrew was armed only as a .last resort, and did not intend to voluntarily enter into the difficulty, and did not enter into it voluntarily, then the homicide was justifiable, and it would be your duty to acquit them.

"(20)  Evidence has been offered before you for the purpose of showing that the deceased had made threats of violence towards the defendants prior to the difficulty, and also that he had been carrying a weapon.  You should consider this evidence, and if you believe that the deceased had made threats of a violent nature towards the defendants, and was carrying a weapon for the purpose of engaging into a difficulty with the defendants and for the purpose of taking their lives, you should consider the circumstances in connection with the other facts in the case for the purpose of ascertaining whether or not the deceased was probably

the aggressor in the difficulty and began the conflict in which he lost his life, and if you believe that threats of a violent nature by the deceased against the defendants had been communicated to the defendants prior to the homicide, you may take this fact into consideration in connection with the proof in the case for the purpose of ascertaining whether or not the defendant Andrew McDaniel reasonably and in good faith believed that he, or his brother, or both, were in danger of losing their lives, or receiving great bodily injury at the hands of the deceased at the time of the homicide.

"(21) Evidence has been offered before you for the purpose of showing the reputation of the deceased as a quarrelsome, dangerous man. You should consider this evidence in connection with the other evidence in the case, and, if you believe that the deceased had the reputation of being a quarrelsome, dangerous man, you may consider that fact in connection with the other proof, in ascertaining whether or not he was the aggressor and brought on the difficulty, and if you find that he had such reputation, and that it was known to the defendants, you may consider that fact, in connection with the other proof in the case, in ascertaining whether or not the defendant Andrew McDaniel reasonably and in good faith believed that he, or his brother, or both, were in danger of losing their lives or receiving great bodily injury.

"(22) Neither threats of themselves, nor the bad reputation of the deceased, if he had such a reputation, will justify the homicide in this case, if you believe beyond a reasonable doubt that the defendants, or either of them, were aggressors, or that they entered voluntarily into the conflict.

"(23) You are instructed that the proof with reference to the first encounter before Andrew McDaniel procured the shotgun can only be considered by you in connection with the other proof in the case for the purpose of ascertaining the state of mind of the respective parties at the time of the homicide, and for the reason of ascertaining who probably began the difficulty and whether the defendant Andrew McDaniel reasonably and in good faith believed that he or his brother, or both, were in danger of losing their lives or receiving great bodily injury at the time of the subsequent difficulty in which the deceased was slain.

"(24) Evidence has been offered before you for the purpose of showing that prior to the time of the homicide the defendant had made threats of a violent nature towards the deceased. If you believe that such threats had been made, you

will consider this fact in connection with the other proof in the case for the purpose of ascertaining whether or not the defendants were the aggressors, or entered voluntarily into the difficulty.

"(25)  The defendants are presumed to be innocent until their guilt is established by the evidence beyond a reasonable doubt, and this presumption continues until every material allegation of the information is proven by the evidence beyond a reasonable doubt.

"(26)  By reasonable doubt is meant a real, substantial, doubt of the guilt of the defendants existing or arising in your minds after a fair consideration of all the evidence in this case.  It is more than a mere surmise, conjecture, or fanciful doubt.  It is such a doubt as would cause a reasonable or prudent man to pause or hesitate before acting on matters of grave importance to himself.  If, after considering all the evidence, your judgments or understandings are convinced and satisfied of the guilt of the defendants, if you have a fixed abiding conviction, amounting to a moral certainty, that they are guilty, then you have no reasonable doubt and must convict, and, unless your minds are in this condition, you will acquit.

"(27)  You are the sole judges of the evidence, the weight of the evidence, and the credibility of the witnesses.  In passing upon the evidence of the witnesses you may take into consideration their demeanor on the stand, their interest in the case, if any, their means of knowing the facts concerning which they testify, whether or not they have been contradicted or otherwise impeached, their relations to the defendants, and to the deceased, if any, the reasonableness or unreasonableness of their statements, and all the circumstances proven before you."

*C. E. Dudley* and *B. B. Sturgeon,* for appellants.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above).  First. After the jury had been impaneled and when the first witness was placed upon the stand by the state, the appellant Joe McDaniel offered the following objection to the admission of any testimony against him:

"(1)  Because the information presented by the state herein is insufficient in law upon which to base a prosecution.  (2) Because said information is void *ab initio,* is contrary to the Constitution of the state of Oklahoma, is contrary to the Con-

stitution of the United States of America, and is contrary to the statutes in such cases made and provided. (3) Because there is no allegation in said information relative to the defendant Joe McDaniel, other than a mere conclusion of the pleader thereof, in this: that said information nowhere alleges that the defendant Joe McDaniel was present, acted, aided, or abetted his codefendant, Andrew McDaniel, in the commission of said alleged offense, as set up in said information. Said information among other things alleges that the defendant Andrew McDaniel shot and killed the deceased, Bill Smith, but fails to allege in what particular, if any, the defendant Joe McDaniel was connected with said alleged offense. (4) Because the mere statement and conclusion of the pleader that the defendants 'acted together' in no wise apprises the defendant Joe McDaniel of what time, or place, or in what manner the state will seek to prove that he acted with said Andrew McDaniel, and said allegation is so vague, uncertain, and ambiguous that it does not apprise the defendant Joe McDaniel of what he is called on to meet."

We fail to discover any insufficiency in the information. Instead of being contrary to the Constitution of this state, it is expressly authorized by that instrument. Section 25 of Williams' Const. of Okla. is as follows:

"No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment or by information. No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination. Prosecutions may be instituted in courts not of record upon a duly verified complaint."

See, also, *In re McNaught,* 1 Okla. Cr. 528, 99 Pac. 241.

It is true that the information does not allege that there had been a preliminary examination of appellants before an examining magistrate, or that they had waived such preliminary examination, as the Constitution provides shall be done. It cannot be doubted but that a defendant has a right to insist upon such an examination before he can be called upon to answer an information, but the Constitution provides that he may waive such examination, and we think that he may waive it when called upon to plead to the indictment or information as well as when brought before a magistrate for examination. This is not a matter which

goes to the merits of the trial, but only to the regularity of previous proceedings.

If he makes no objection on the ground that such examination has not been had or waived, he must be understood to admit that it has been had, or that he waived or now intends to waive it. If he intends to insist upon the want of an examination, he should by plea in abatement set up the fact that it has not been had. We do not think it is necessary that an indictment or information should charge that the defendant has had an examining trial, or that he has waived the same. This question has repeatedly been passed upon heretofore and always adversely to the contention of appellant. See *Wood v. State,* 3 Okla. Cr. 563, 107 Pac. 937; *Caples v. State,* 3 Okla. Cr. 72, 104 Pac. 493, 26 L. R. A. (N. S.) 1033; *Canard v. State,* 2 Okla. Cr. 505, 103 Pac. 737, 881, 139 Am. St. Rep. 949. If it is necessary to allege in an information that there had been a previous preliminary examination as a result of which the defendant was held to answer the accusation against him, or that the defendant had waived such preliminary examination, then it would be necessary to prove these allegations. This would place an unjust burden upon a defendant, because it might create the impression upon the minds of the jury that in the opinion of the examining court the defendant was probably guilty, or if he had waived such preliminary trial the jury might consider this as an admission or plea of guilty on his part. In either event, he would have to combat one or the other of these impressions in addition to the testimony offered against him upon his final trial. Therefore the safest and fairest plan is to omit such allegations from the information. So far as the information being contrary to the Constitution of the United States is concerned, there is nothing in that instrument which in any manner prohibits a state from prosecuting a felony by information. This question has been so often decided by every court to which it has been presented that it is useless to cite authorities in support of it. Counsel will look in vain for a single authority supporting their contention.

Counsel for appellants in their brief say:

"Before any testimony was admissible against the plaintiff in error Joe McDaniel, said information should have contained

the allegation of in what manner and by what means the plaintiff in error Joe McDaniel aided and abetted his codefendant in error, Andrew McDaniel."

We cannot agree with this contention. All that is necessary for an indictment or information to allege is the ultimate facts to be proven. The information in this case charged that said Andrew McDaniel and Joe McDaniel, acting together, did then and there, feloniously, etc. So far as Joe McDaniel was concerned, the ultimate facts to be proven against him were that he acted with Andrew McDaniel with a premeditated design to effect the death of the deceased, and in pursuance of such design Andrew McDaniel shot and killed the deceased. It would be multifarious and bad pleading for an information to attempt to state the evidence upon which the pleader relied. We think that the information in this case was sufficient if attacked by demurrer or motion to quash. Even if we were in doubt about this matter, we could not sustain the contention of counsel, because their attack upon the information was made for the first time by objection to the introduction of testimony.

When an objection to an information is presented for the first time upon a motion to exclude testimony, the motion should be overruled, if by any intendment or presumption the information can be sustained. See *Edwards v. State,* 5 Okla. Cr. 20, 113 Pac. 214; *White v. State,* 4 Okla. Cr. 143, 111 Pac. 1010. The court therefore did not err in overruling the motion to exclude testimony as against Joe McDaniel.

Second. Appellants complain that the court erred in permitting the state's witness Zack Williams to testify as to threats made by Andrew McDaniel, upon the ground that the said threats were vague and indefinite, and were not proven to have been directed toward the deceased. The testimony upon this subject is as follows:

"Q. State your name to the jury? A. Zack Williams. Q. Where do you live? A. Finley. Q. Are you acquainted with the defendants in this case? A. Yes, sir. Q. Were you acquainted with the deceased in his lifetime? A. Yes, sir; I had known Mr. Smith about two years. Q. Were you in Poteau in November of last year? A. Yes, sir. Q. Under what circumstances were you there? A. I was there as a witness. Q. In what case?

"Defendant:   We object.

"The Court:   The objection is overruled.

"A.   In the case of the state against Henry McDaniel.   Q. Who is Henry McDaniel?   A. He is a brother of these two boys. Q. Were they there at that time?   A. Yes, sir.   Q. Was the deceased there?   A. Mr. Smith?   Q. Yes.   A. Yes; he was there. Q. Was he a witness in the Henry McDaniel case?   A. Yes; I think so.   That was my understanding.   Q. What was Henry McDaniel charged with?

"Defendant:   We object because it is immaterial, irrelevant, and inadmissible, and because it is not the best proof.

"The Court:   Your contention is that it should be proven by the record?

"Defendant:   Yes, sir.

"The Court:   I don't think it is necessary in this case.

"A.   The prosecuting attorney in making his statement said he was charged with larceny.   Q. Whose cattle was it alleged that he stole, Mr. Smith's, the deceased's?   A. Yes, sir.   Q. Did you hear a statement made by either of the defendants?

"Defendant:   I do not want to take the time of the court, but I want to object to all this testimony.   It is immaterial, hearsay, not the best proof, and for the other reason that I have mentioned.

"The Court:   All right, sir.

"Q.   Did you hear any statement made by either of these defendants at Poteau in regard to the Henry McDaniel case? A. Oh, yes; we talked a great deal about the case.   Q. After the verdict of the jury was there any statement made by either of the defendants at the hotel in Poteau?   A. Yes, sir.   Q. By which one?   A. By Andrew.   Q. Under what circumstances and what was the statement?   A. I just went in the hotel.   Andrew was sitting nearly in front of the door.   I was sitting on the left of Andrew, and Mr. Kemp, a brother-in-law of Andrew, was sitting about here, and there were two other witnesses from down in the country.   I believe their names are Lunsford and Connelly, and I do not know whether the hotel man was there just at that time or just before or after.   He was showing people their rooms, and sometimes he was there and sometimes he was not. I was sitting right in front of the stove in the Commercial Hotel and Andrew made the remark:  'They have got Henry in jail. That's what they wanted all the time, but they swore damned lies to put him there, and I'll kill the son of a bitch that put him there as sure as powder will burn.'   That is the exact language."

Henry McDaniel had been tried and convicted for the larceny of cattle owned by deceased, and the deceased had testified against him on said trial. We think that the threat made by Andrew McDaniel clearly included the deceased, as the deceased was the prosecutor in said case. The modern rule is to admit generic threats or threats directed toward a class and leave their weight for the jury. On this subject Prof. Wigmore says:

"It has been noted (*ante*, sec. 103) that the more specific a design is the greater its probative value. There may come a point at which the design is too indefinite in its indications to be of any probative value; but the mere fact that it is generic—*i. e.*, points towards a class of acts—however broad, does not in itself destroy its relevancy, provided the purpose might naturally include the act charged." (1 Wigmore on Evidence, sec. 106.)

Mr. Wigmore cites an unanswerable array of authorities in support of this proposition. If the deceased was not personally threatened, he at least belonged to the class who were referred to, and he was therefore necessarily included in the threat made. It is true that Joe McDaniel was not present when Andrew made this threat, but this is immaterial, because the testimony shows that he had made similar threats himself, and that during this entire transaction he was acting with Andrew. Therefore the threat of one was the threat of both of them. The court did not err in admitting this testimony.

Third. Appellants next complain that the court erred in permitting the state's attorney to require the defendant Joe McDaniel to testify while upon the stand on cross-examination that he had been convicted in Texas of murder in the second degree and sent to the penitentiary for this crime; he having already testified that he had been convicted of a felony. We think this contention is without merit. In the case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, this court held:

"Upon cross-examination for the purpose of affecting the credibility of a witness, he may be asked if he has ever been convicted of a felony or of any crime which indicates a want of moral character."

The law classes all felonies as infamous, but in everyday life we know that different degrees of infamy attach to different

felonies, and we think that the jury had a right to know of what particular felony the witness had been convicted, for the purpose of affecting his credibility.

A number of other questions were presented in the assignment of errors and discussed in the brief of counsel for appellants, all of which we have carefully considered, and we are of the opinion that they are immaterial, and did not in any manner affect the final decision of this case. We have frequently stated that, when a defendant was properly indicted and fairly tried and proven to be guilty, we will not reverse a conviction upon light and trivial grounds. This court is not trying to build up a complicated scientific system of criminal jurisprudence. Our entire effort is to give the laws of Oklahoma a common-sense construction, and to place them upon the basis of reason and justice. We care absolutely nothing for fine-spun theories and speculations. These men have been fairly tried, and the testimony proves conclusively that they are guilty. Why put the people of Oklahoma to the expense of a second trial? The charge of the court is a model one, and, if all of the trial judges had the faculty of stating the law in their charges in the concise and logical manner expressed in the court's charge given in this case, there would be fewer reversals of convictions in Oklahoma. Neither would this court be called upon continually to apologize for the harmless errors committed by our trial judges. The reporter will incorporate the instructions in full in connection with this case, as they completely cover the law applicable to the facts proven. We think that under the evidence both of the appellants acted together and they sought, provoked and without necessity or apparent necessity voluntarily entered into a combat with deceased with a premeditated design to effect his death, and that their conviction was a proper vindication of law and justice. We regard this as the clearest case of mutual combat that has ever been presented to this court.

We find no material error in the record. The judgment of the lower court is in all things affirmed.

ARMSTRONG and DOYLE, JJ., concur.