ISAAC SEARS v. STATE.

No. A-4423. Opinion Filed July 19, 1924.
(227 Pac. 899.)

(Syllabus.)

Homicide—General Threats Against Class Including Deceased, Admissible—Threats Shown in Chief, on Cross-Examination, or in Rebuttal. Threats of a general or indefinite nature, made by

an accused person, where they tend to disclose general malice, may be shown, although not particularly directed against the deceased, but against a class of persons which includes the deceased.

(a) In a proper case such threats may be shown as evidence in chief, or on cross-examination, or in rebuttal.

Appeal from District Court, Washington County; Chas. W. Mason, Judge.

Isaac Sears was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Bailey & Dillon, for plaintiff in error.

The Attorney General, for the State.

BESSEY, J. By verdict of a jury, rendered February 14, 1922, in the district court of Washington county, plaintiff in error, Isaac Sears, here referred to as the defendant, was convicted of manslaughter in the first degree, and by the judgment of the court subsequently rendered his punishment was fixed at confinement in the penitentiary for a term of four years.

The facts and circumstances leading up to and connected with the homicide, as disclosed by the record, show that Isaac Sears was city marshal of the town of Ramona, and also a deputy sheriff of Washington county; that on the night of May 11, 1921, the telephone operator at Ramona received a message from the sheriff's office at Pawhuska, in Osage county, to the effect that two men had killed an officer at Pershing and were fleeing towards Ramona in a stolen Dodge roadster, and requesting the telephone operator to communicate with the local peace officers to look out for this Dodge roadster and its occupants. This information was communicated to the defendant, and he, in company with a local constable, Bert Blythe, went to a bridge which spans a creek at the entrance to Ramona to intercept this Dodge roadster and capture the felons, if possible.

Some 30 minutes after the defendant and the constable had stationed themselves at this bridge a car came over the hill from the west, a short while after dark. The car was moving rapidly, with the lights burning. Defendant waved a flashlight as a signal to the occupants of the car to stop, and as the car approached the bridge he commanded them to stop. The car did not stop, and as it passed on over the bridge the defendant fired four shots from his revolver into and about the car. One of the bullets so fired entered the back of the head of the driver, Harry F. Cavis, killing him instantly. It was shown that Cavis was a man 42 years of age, a traveling salesman for a grocery house, and that he visited Ramona regularly to supply the grocery stores there, and traveling from town to town in a Dodge touring car. On this day Mrs. Betty Campbell, who lived in Ramona, had asked Cavis to take her out to a Mrs. Kizer's house, a few miles distant in Osage county; this he had done, and he and these two women were returning to Ramona in his car when they were intercepted at the bridge by these two officers.

Blythe, the constable, testified that Sears, the defendant, called him up and told him he had had a telephone message from some place over in the Osage county, informing him that the marshal had been killed, and asked the witness Blythe to come with him and help watch for the car in which the felons were supposed to be coming that way; the witness agreed to assist, and met him at the public square, where the defendant told the witness they were instructed to intercept a Dodge roadster, occupied by two men; that the witness and the defendant went to the bridge just outside of Ramona, and had waited there 30 minutes or more when a car approached, coming over a hill about one-fourth mile distant. Defendant said to the witness: "I'll stand here at the bridge and you get further down and wave them down." The witness then advanced 50 feet or more from the end of

the bridge and waved his hand, indicating that he wanted the driver to stop. The car slowed down slightly and passed on up grade to the bridge where the defendant was standing, where defendant waved his flashlight and commanded the driver to halt. As the car approached the defendant, the witness shouted to him that it was a touring car. When the car had gone about 15 feet past the defendant, the defendant shot into the back of the car, and as the car moved on, a few seconds later the defendant fired three more shots into and about the car, which then swerved and ran into the ditch, and stopped. The two women occupants became excited and hysterical. The witness, addressing the defendant, said, "Ike, I believe you killed your man," and defendant replied, "Well, he ought to have stopped."

Mrs. Betty Campbell testified that they were driving, in her judgment, about 15 miles an hour or a little faster, and that they did not see the defendant and Blythe until the car was about to cross the bridge, and that as the car passed them either the defendant or Blythe shouted, "Hold up!" that after the car had passed a few feet a shot was fired, the bullet penetrating the back of Cavis' head, who slumped down and lost control of the car as it moved along under its own momentum. Almost immediately three more shots were fired, one of which passed through the wind shield, over witness' head, as she sat bent over with her head on her knees. Witness asked the defendant what he shot for, and defendant replied, "Because he didn't stop." Mrs. Kizer then said, "You didn't give him time to stop"; to which defendant made no reply.

Mrs. Kizer testified that she was excited; that as soon as the shooting began the speed of the car was checked, and that after the shooting was over she ran away for help. She

assumed that the persons who did the shooting were robbers. She heard no command from the defendant or Blythe to stop or halt.

The defendant testified in his own behalf that the moon was shining; that it wasn't very dark or very light; that as the car approached, Blythe shouted, "Halt," and the car passed Blythe without slowing up; that he stood in the road at the bridge, waving his flashlight, and that he was compelled to step out of the road to avoid being run over as the car passed; that as he stepped out of the road he shouted "Halt," and a moment later fired the first shot, when the car was about 30 feet distant. Defendant stated that he had no intention of killing any one; that he aimed high for the purpose of causing the driver to stop.

On cross-examination the defendant was interrogated as follows:

"Q. Do you know Mrs. Ora C. Disch? A. Yes, sir.

"Q. Did you see her on the 11th day of May, 1921, at between 3 and 4 o'clock in front of the Ross Mercantile establishment? A. No, sir.

"Q. The afternoon of the 11th of May, the afternoon of the shooting, between 3 and 4 o'clock? A. No, sir.

"Q. Didn't you see her in front of the Ross Mercantile establishment at the time I have stated, and say to her, 'I have got my commission now; I have got the law back of me, and the first man that disobeys my command I am going to shoot him in two?' A. I did not.

"Q. Didn't you say that, or that in substance? A. I did not.

"Q. Did you say that any time and place that day? A. No, sir."

In the rebuttal, for the state, Mrs. Disch testified in part as follows:

"Q. Mrs. Disch, are you acquainted with the defendant, Isaac Sears? A. Yes, sir.

"Q. I will ask you if you saw him on the afternoon of May 11, 1921, between the hours of 3 and 4 in front of the Ross Mercantile establishment? A. Yes, sir.

"Q. Did you have a conversation with him there? A. Yes, sir.

"Q. I will ask you if he said this, or this in substance, to you: 'I have got the law back of me, and the first man that disobeys my command, I am going to shoot him in two?' A. He most certainly did."

On cross-examination Mrs. Disch testified thus:

"Q. Well, he (the defendant) had arrested your boy along about that time, hadn't he? A. Yes, sir, some time before that.

"Q. Did you tell anybody that day? A. Well, nothing more than I just repeated it to my son, what he said.

"Q. Well, at the time you had the conversation to which you have testified, had Mr. Sears arrested your boy at that time? A. Yes, sir.

"Q. How long before? A. Well, I wouldn't be able to state just exactly, but it happened a few days before.

"Q. I will ask you, Mrs. Disch, if it is not a fact that on this particular day—that is, on the 11th day of May, 1921—you didn't have any conversation with Mr. Sears at all? A. Yes, sir; I had a conversation with Mr. Sears in the afternoon.

"Q. How is that? A. I started down town and met Mr. Sears in front of this store, and we were talking in regard to a fine that had been placed on the boy, and he was talking of bringing him to Bartlesville because the fine had not been paid—Mr. Seegar and Mr. H. B. Lowe had stood good for it—and in the meantime he made the remark as I have testified to.

"Q. And how is it that you fixed it in your mind that that was the same day, the 11th day of May? A. I know positively it was the same day he shot the man, that he said what I have just testified to.

"Q. Couldn't have been the day before? A. No, sir; it was not the day before.

"Q. Well, what is it that fixes it in your mind that this was the same day you had this conversation? A. Well, when this occurred, when the shooting occurred, my son came and told me that Mr. Sears had killed a man, and I said, 'Son, he done just what he told me this afternoon he would do.' "

The only assignment of error supported by argument in defendant's brief is that the court erred in admitting the testimony of Mrs. Disch, as not being properly admitted for purposes of impeachment, because no sufficient foundation was laid; and that if it was admitted for the purpose of showing malice and intent it should have been introduced as evidence in chief; and that it was not admissible as evidence in chief or on rebuttal for the reason that the declarations or threats said to have been made by the defendant ("I have got my commission now; I have got the law back of me and the first man that disobeys my command, I am going to shoot him in two") were too vague and indefinite, referring to no particular person or class of persons.

The statements and testimony of the defendant, quoted, as well as other testimony not quoted, indicate that he had no conception of his duties as a peace officer, or of the sanctity of human life—that he was an arrogant deputy sheriff who would shoot to kill or wound any person who failed to obey his "commands." The record shows that the deceased came unwittingly within this class. In this instance the defendant, without any right, excuse, or justification, instantly snuffed out the life of an innocent man. Defendant's conduct at the time, the physical facts shown, and the testi-

mony of eyewitnesses indicate that he shot into this car intentionally, and that his claim that he shot high in order to frighten the deceased is not sustained by any evidence, direct or circumstantial. The threat which he had made, as quoted, indicates a malicious mind, and an arrogant purpose to shoot on any pretext, regardless of human life. His conduct in this case is in keeping with the spirit of the declaration previously made on that day. The statement so made by him could have been introduced by the state as evidence in chief, as tending to show motive or intent; or on cross-examination of the defendant; or in rebuttal, as shown by this record. Under the circumstances, the order or manner of its introduction was of no consequence.

Threats of a general or indefinite nature made by an accused person, where they tend to disclose general malice, may be shown, although not particularly directed against the deceased, but against a class of persons necessarily including the deceased. 13 R. C. L. 925.

In the case of McDaniel v. State, 8 Okla. Cr. 209, 127 Pac. 358, the accused had made this statement: " 'They have got Henry in jail. That's what they wanted all the time, but they swore damned lies to put him there, and I'll kill the son of a bitch that put him there as sure as powder will burn.' " This court held that this was properly admitted as a threat against the prosecuting witness; that generic threats, or threats directed against a class, are admissible, and their weight is for the jury. On this point Prof. Wigmore says:

"It has been noted that the more specific a design is, the greater its probative value. There may come a point at which the design is too indefinite in its indications to be of any probative value; but the mere fact that it is generic—

i. e., points towards a class, however broad—does not in itself destroy its relevancy, provided the purpose might naturally include the act charged." 1 Wigmore on Evidence, sec. 106.

A late holding of this court to the same effect is Gross v. State, 26 Okla. Cr. 105, 222 Pac. 275.

All parts of the record indicate that the defendant had a fair trial.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.