## BROWN v. STATE.

### No. A–11920.

Criminal Court of Appeals of Oklahoma.

March 31, 1954.

Rehearing Denied April 21, 1954.

734

Sam Y. Colby, Madill, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., James P. Garrett, Asst. Atty. Gen., for defendant in error.

JONES, Judge.

The defendant Earl Kenneth Brown was charged by an information filed in the District Court of Marshall County with the crime of murder; was tried, found guilty of manslaughter in the first degree, but the jury was unable to agree upon the punishment and left it to be fixed by the court. Thereafter, the defendant was sentenced to serve a term of 15 years imprisonment in the penitentiary and has appealed.

The State contended that the defendant shot and killed Mrs. Zonia Hughes with a .22 rifle. The evidence of the State established that the defendant had married Gladys Hughes, a daughter of deceased, in 1927; that they separated in 1948, and were divorced in December, 1949. Three sons were born to that marriage and were all grown at the time of the homicide. One of the sons was in the Army and two were living with the defendant at their home at County Line, which is a small town north of Healdton. The deceased lived with her husband about six miles northwest of Madill. The evidence showed that the relationship between the defendant and the Hughes family was bad after the divorce of the defendant and his wife. On two occasions, according to the evidence of the State, he made threats against the life of the deceased and other members of the family. The latest of those threats was made to his ex-wife in the city of Madill on the afternoon of March 29, 1952, just preceding the fatal shooting about 8:00 that night.

Bonnie Woods, another daughter of the deceased, and her husband, Homer Woods, were visiting at the home of the deceased and her husband, Robert Hughes, on March 29, 1952. A little after 8:00 p. m. a vehicle was seen approaching the house with only the left front headlight burning. The premises were lighted enough that it could be seen that it was a truck of some kind. When it arrived in front of the Hughes house it turned around and then backed up over the fence, tearing the fence completely down. Homer and Bonnie Woods testified that they recognized the voice of the defendant when he yelled, "Come on out and get it, you old sons of bitches."

Immediately after these words were shouted, someone from the truck started shooting into the Hughes house. The deceased had been in poor health for several months and was in her bedroom at the time the truck allegedly driven by the defendant arrived at the house. The light was burning in her bedroom. She sat up on the edge of her bed when the commotion started and one of the bullets fired at the house struck her near the right shoulder. She was taken to the University Hospital in Oklahoma City and there died on April 8, 1952.

Dr. Paul Obert, an expert pathologist, testified that he performed an autopsy upon the deceased and determined that the cause of her death was a blood clot, and that the blood clot which caused her death was a result of the gunshot wound which the deceased had received.

After the shooting occurred, the truck left the Hughes premises in great haste. The officers were notified of the shooting and they immediately went to the Hughes residence and made an examination.

They found where a motor vehicle had turned around in the fresh dirt and backed over the fence. They examined the imprint made by the tires and from the size of the tire tracks, they concluded it was a truck. The two tires on the left side were

slick with the tire on the left front having a mark around the outer edge of the tire, while the two tires on the right side were comparatively new tires which made a clear imprint in the dirt. Later, the officers in checking saw where the same vehicle had turned off the road about a mile from the Hughes home, toward the house of Roy Kirtley. (Defendant admitted that he had driven the truck to Roy Kirtley's house the night of the shooting.) Two days later, a truck was found abandoned on the road near County Line. The tires were exactly like those which made the tracks at the Hughes home the night of the shooting. Only the left headlight of the truck would burn. The title to the truck was in defendant's name. A search was commenced for defendant, but he was not arrested for three or four more days when he voluntarily surrendered himself with the explanation that he had been off on a fishing trip and did not know that he was wanted.

Defendant admitted that he had been in Madill the day of the shooting, drinking beer, and that he had a conversation there with his ex-wife. He specifically denied making any threats towards her or any member of her family at any time. He further admitted that when he left his home at County Line on March 28th, he had a .22 pump rifle in his truck, but that when he returned to County Line two days later, the rifle was missing.

The defense was in the nature of an alibi. Defendant contended that the late afternoon of March 29th, he drove from Madill out to the home of Joe Fowler and remained there until 10 or 15 minutes until 8:00 p. m., and then drove into Madill. That as he approached a traffic light in Madill his truck stopped running; that he borrowed some tools from one Thurman Qualls and worked on his truck until about 9:00 p. m. (According to this testimony defendant would have been busy at his truck repairing it at the time the shooting occurred at the Hughes residence.)

After the truck had been repaired, defendant drove to Roy Kirtley's house, arriving there about 9:00 or 9:30 p. m., where he stayed about 45 minutes; that he then drove to Ardmore, and then on to his home at County Line about midnight.

Thurman Qualls corroborated defendant's story as to the breakdown of defendant's truck, and that Qualls held a flashlight while defendant worked on the truck from about 8:00 p. m. until 9:00 p. m. In rebuttal, the State put on three witnesses who testified that between 8:00 and 9:00 p. m. Qualls was in Sartin's Pool Hall in Madill.

It was stipulated that Joe Fowler would testify if present that defendant stayed at Fowler's home until 10 or 15 minutes until eight o'clock the night of the shooting. Roy Kirtley also corroborated defendant's testimony concerning the fact that defendant came to his house about 9:30 p. m.

The above summary is brief. There were many witnesses who testified on each side, but it is a sufficient statement of the evidence for the purpose of a discussion of the issues which are presented in the briefs.

 It is first contended the court erred in refusing to continue the case upon defendant's motion because of the absence of the witness Joe Fowler. The county attorney, at the time the motion was presented, went farther than the law requires in that he admitted that the affidavit as to what the absent witness would testify was true. All that was necessary for the county attorney to do was to admit that if the witness was present he would testify to the facts stated in the affidavit. Andrews v. State, 84 Okl.Cr. 104, 179 P.2d 491. There certainly was no abuse of discretion in denying defendant's motion for continuance because the county attorney stated that defendant was at Joe Fowler's home as contended by the defendant, until 10 or 15 minutes before eight o'clock the night of the homicide. It was the contention of the State that defendant left the Fowler home and drove to the Hughes home while he was partially intoxicated and fired the fatal shot.

 It is contended that the evidence was insufficient to sustain the conviction. There was a sharp conflict in the evidence. The proof of the State was circumstan-

tial but it presented a strong case of guilt. There were threats made against the de-· ceased and her family just two or three hours before the shooting occurred. Defendant was in Madill that afternoon and was slightly intoxicated from drinking beer. He had been a member of the family of deceased through marriage for over 21 years and his voice was easily recognizable. Not only was his voice recognized at the scene of the shooting, but the truck in which the assailant was riding was easily identified as defendant's truck by the tire marks and by the fact that only the left headlight was burning. Furthermore, the deceased was shot with a .22 rifle. A .22 rifle had been carried in defendant's truck at the time he left County Line on March 28th, but, according to his testimony, became lost somewhere on the trip to Madill. The officers were never able to recover this gun and thus compare a bullet fired from it with the bullet removed from the deceased. We feel that the evidence, though circumstantial, was sufficient to sustain the conviction.

The next proposition of defendant is that the court erred in submitting the issue of manslaughter in the first degree for the reason that the defense was in the nature of an alibi and that under the evidence defendant was either guilty of murder or nothing.

■ We cannot agree with this contention. In the recent case of Igo v. State, Okl.Cr., 267 P.2d 1082 this court held:

> "Where a defendant is charged with the crime of murder, it is the duty of the trial court to instruct on the law of manslaughter in the first or second degree, if there is any evidence that the alleged crime might have been committed under circumstances that would reduce the crime from murder to manslaughter, and this is true whether the evidence comes from witnesses produced by the State or by the accused, or by both."

Although the evidence of the defendant was in the nature of an alibi, the proof of the State was such that a jury might con-

clude that the defendant, after meeting his ex-wife in Madill the afternoon of the homicide, and drinking beer with her and discussing a reconciliation with her, began thinking of his ex-wife's family, got in his truck, and in the heat of passion, drove to the home of the deceased and there commenced to spray it with bullets, one of which struck and caused the death of Mrs. Hughes. Not only might the jury draw this conclusion from the evidence, but we think such is the logical conclusion they did adopt, as shown by their verdict. Homicide is manslaughter in the first degree, when perpetrated without a design to effect death and in the heat of passion, by means of a dangerous weapon, etc. 21 O.S.1951 § 711.

■ It is contended that the prosecuting attorney was guilty of misconduct in asking leading and suggestive questions of the witnesses. We have carefully read the record with this assignment of error in view, for the purpose of determining whether there had been such conduct on the part of the prosecution in the asking of leading questions that the defendant was denied a fair trial. As is usual in most of the cases which are appealed to this court, we find that counsel on both sides did ask some leading questions. There are remarkably few, however, in this record, and were not of such consequence that it can be said that the attorneys placed the answer in the mouth of the witness. As between the conduct of the prosecuting attorneys and counsel for the accused, the record discloses far more leading questions by counsel for the accused than those by counsel for the State.

■ It is next contended that the county attorney made an inflammatory and vicious argument in his opening statement to the jury. Counsel have failed to point out the particular parts of the opening statement which it is contended constituted an inflammatory argument. The opening statement appears to us to be a fair statement of what the county attorney expected to prove. In some particulars, it was rather detailed, but it consisted of a statement of facts expected to be proved and such as

a county attorney was authorized to make in order to intelligently apprise the jury of what the State contended were the facts.

▬ It was contended that the trial court erred in admitting evidence of threats made by the defendant toward the deceased and her family. The evidence of the State showed two occasions on which the accused allegedly threatened the deceased; one in November of 1950, and the other on the day of the homicide. This evidence showed a motive for the killing in that it disclosed that defendant believed the deceased and her family were responsible for the separation of the accused and his wife. In the case of Sears v. State, 27 Okl.Cr. 311, 227 P. 899, this court held:

"Threats of a general or indefinite nature, made by an accused person, where they tend to disclose general malice, may be shown, although not particularly directed against the deceased, but against a class of persons which includes the deceased. In a proper case such threats may be shown as evidence in chief, or on cross-examination, or in rebuttal."

The next assignment of error is directed at the refusal of the court to give certain instructions requested by the defendant. There were four instructions requested in defendant's behalf. Three of them were given in substance as requested, although one of them should not have been given as it was far too favorable to the accused and was not a correct statement of the law. This assignment of error then, is/ determined by the question as to whether the court erred in refusing to give defendant's requested instruction No. 2. This instruction reads:

"You are further instructed that in this case the State of Oklahoma and the prosecution has attempted to introduce and prove that the automobile or truck tracks found near the home of the deceased were the same tracks or treads that were on the tires of the truck belonging to the defendant, and the officers did not make any cast of the tracks of the car or truck nor did they take the defendant's truck to the place where the purported tracks were made near the home of the deceased and compare the same; therefore, you are hereby instructed to disregard all of that testimony that is not to be considered as any part of the evidence in your deliberations in this case, because the comparison of the truck tracks were not properly made and the testimony is too indefinite."

▬ We feel no extended discussion of this instruction is necessary as it shows on its face that if given by the court it would constitute an unwarranted comment on the evidence. The matter about which the defendant complains—the failure of the officers to make casts of the tracks made at the scene of the tragedy for comparison with the tires on defendant's truck—goes to the weight of the evidence and not to its admissibility. The officers who saw the tire tracks at the Hughes premises and saw the tires on the truck of the defendant said that the truck tires made the imprints at the Hughes residence. This evidence was competent for the jury to consider for such weight as they might see fit to give it and it would have been erroneous for the court to have given defendant's requested instruction.

▬ Under our system of criminal jurisprudence, the members of the jury are the exclusive judges of the weight and credibility to be given to the testimony of the witnesses, and the trial court should not comment upon the credibility of any witness or the weight of the evidence as to the same would constitute an improper invasion of the province of the jury. Hill v. State, 76 Okl.Cr. 371, 137 P.2d 261. The record discloses a trial held in substantial compliance with all the requirements of the law, and we can find no error of sufficient importance as to justify or require a reversal of the case.

The judgment and sentence of the District Court of Marshall County is accordingly affirmed.

POWELL, P. J., and BRETT, J., concur.