DAN SCRIBNER v. STATE.

No. A-1634.    Opinion Filed December 5, 1914.

(144 Pac. 626.)

1.    **HOMICIDE—Sufficiency of Evidence—Verdict.**    (a) When an
      examination of the entire record and a review of all the facts
      discloses the commission of a wanton and deliberate assassination,
      and that, beyond question, the person convicted fired the fatal
      shot without semblance of justification, this court will not re-
      verse a conviction, unless the record discloses fundamental error
      which did, or was reasonably calculated to, deprive the person
      on trial of substantial rights.
          (b)  For facts held sufficient to sustain a conviction of mur-
      der, see opinion.

2.    **APPEAL—Harmless Error—Instructions—Reasonable Doubt.**  For
      an instruction which is not sufficiently erroneous to justify a
      reversal of conviction under the record, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Dan Scribner was convicted of murder, and appeals. Af-
firmed.

See, also, 3 Okla. Cr. 601, 108 Pac. 422, 35 L. R. A. (N.
S.) 985.

*Crawford & Bolen,* for plaintiff in error.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

ARMSTRONG, P. J.   The plaintiff in error, Dan Scrib-
ner, was convicted at the October, 1911, term of the district court
of Seminole county on an indictment charging him with the
murder of Zeke Putman, and his punishment fixed at imprison-
ment in the state penitentiary for life.   The indictment alleges
that the homicide occurred on or about the 16th day of Janu-
ary, 1909.   The homicide occurred in the town of Allen, in
Pontotoc county, and was a cold-blooded assassination.   The
deceased was shot while standing inside a store building by some

one concealed in the dark outside of the building. The weapon used was apparently a 12-gauge shotgun loaded with gunpowder and buckshot. Ed Johnson was jointly charged with the plaintiff in error, by the indictment, of the murder. He confessed to the crime, and testified on behalf of the state in the prosecution.

It was the theory of the state that the plaintiff in error, induced Johnson to assist him in the murder; that for the perpetration of the murder they were to receive 120 acres of land from one Mack Lee. Some time prior to this homicide it appears that the deceased had killed Clarence Lee, a brother of Mack Lee. A short time before Christmas in 1908 the plaintiff in error met Johnson in the town of Ada, and told him that Mack Lee would give them 120 acres of land to kill the deceased, who had been charged with killing a brother of Lee. At that time Johnson refused to have anything to do with the matter. On Christmas eve the plaintiff in error again saw Johnson and told him he wanted him to go with him to Allen to kill Putman. Johnson declined, saying that he had nothing against Putman, or that he didn't think Putman had anything against him. The plaintiff in error stated that Putman had said that Johnson swore a lie in his trial, meaning the trial of Putman for killing Clarence Lee, and made a number of other statements to him. He finally agreed to go. They were to meet at Stonewall. The plaintiff in error was to go to Stonewall on horseback, and Johnson was to go on the train. Late that afternoon they met at the home of John Scribner, brother of the plaintiff in error. That night they went to the home of Mack Lee, armed with six-shooters. Lee was away, but came home during the night. They spent Christmas day at his house. About dark they left Lee's for the town of Allen. One of them rode a bay mare and the other a bay horse. Upon arriving at Allen the horses were hitched a short distance from a blacksmith shop. It appears that a number of persons had gathered at the blacksmith shop and were shooting anvils, among them the deceased. During the celebration the clothing of one Thompson caught

on fire. He ran out into the street, and Putman followed him to put out the fire. The plaintiff in error attempted to shoot Putman at this time, but Johnson interfered, and they got on their horses and returned to Mack Lee's where they spent the night. About the last of December the plaintiff in error and Johnson moved to Idabel, in McCurtain county. About the 10th or 11th of January the plaintiff in error came into the house where Johnson and the plaintiff in error were living, at Idabel, and said that he had a letter from Mack Lee advising that he had to come up and pay off a note. The wife of plaintiff in error remarked, "I guess you will have to go." The two left Idabel on that day, and were seen by Jim Thompson, Bud Gregg, and Bill Nutt. Johnson told them he was going to Texas. Plaintiff in error told them he was going to Hugo. Just before the train left Idabel plaintiff in error told Thompson he was not going up the road at all. When seen by Thompson in Hugo after the train arrived there he was reminded of his statement, and replied that he had said he was not going, but he did. At Hugo Gregg talked to Johnson and the plaintiff in error. The plaintiff in error said he wanted to see a party at Durant. Johnson said he was going to Durant and from there to Texas. They went to Durant that afternoon and from there to Atoka. While in Atoka plaintiff in error bought some shells for a 12-gauge shotgun. The shells were loaded with buckshot.

Witness Patterson testified that he saw Johnson and plaintiff in error together at Atoka. From Atoka they went to Stonewall, and from there to John Scribner's house, about a mile or so in the country. At John Scribner's house were two or three boys. One of these boys was sent by John Scribner to Stonewall to get a shotgun. The boy was named Perriman. He testified that he went and got the gun, which was a 12-gauge shotgun, but did not get any shells. The gun was procured from the store of J. R. Reeves.

Witness Ballew, a member of the Reeves firm, testified that he sent the gun to John Scribner about the time Putman was

killed; that John brought it back on the 23d of January, and paid $2.25 rental for the use of the same. Witness further testified that a short time before Putman was killed John Scribner had made arrangements with him to rent the gun. From John Scribner's, Johnson and plaintiff in error rode a bay pacing horse and a roan mare to the home of Mack Lee and carried the gun with them. Arriving at Lee's they called him out and had a talk with him. He saddled a horse and went with them to the home of Lifley Impson, a mile or two away, where they stayed all night. It appears that Impson was a brother-in-law to Mack Lee. They stayed in the vicinity of Impson's all the next day. During the day they took some drinks, and something was said about having come to do the job if Lee wanted it done. That night they went to the town of Allen to kill Putman. It appears that this was Wednesday night. Arriving at Allen, they hitched their horses and secreted themselves behind a pool hall and store, but did not locate Putman. They returned to Impson's and stayed all night and all the next day and Thursday night. Friday night they returned to the town of Allen, and hitched their horses to the fence of Dr. Gillmore, and again secreted themselves behind the pool hall and store. They saw Putman in the store. The plaintiff in error tried to shoot him, but the gun failed to fire. Witness Ballew testified that he afterward sold this gun to a person by the name of Mann. Witness Mann testified that the gun would frequently fail to fire from the right barrel. When the gun snapped Putman flinched and came out of the back door of the store. Johnson squatted beside the house and plaintiff in error ran away. Witness Sweetman was in the house at the time. He came out with Putman, or rather followed Putman out, and gave him two bottles of tin top. They thought they heard some one, but did not see any one. Johnson and plaintiff in error got their horses and went back to Impson's, and stayed all night, and spent Saturday, the 16th, there. During the day the plaintiff in error and Johnson were out at the barn. Impson came out, and Johnson said: "Right here I am going

Cr. 11—6

to lay down. I am not going to Allen tonight." Impson then said: "Go; I will make one of you a present of a six-shooter and the other $25." Plaintiff in error then told Impson to go get some whisky to go home on. While he was gone after the whisky the plaintiff in error went to the house and secured a Winchester belonging to Mack Lee. About 4 or 5 o'clock Impson returned bringing four or five pints of whisky. They drank a portion of it, and again left for Allen about dark, taking a few drinks on the way. They tied their horses at the same place, and secreted themselves about the same place that they had been the night before. Johnson was near the northeast corner of the building, and plaintiff in error near the northwest corner. In a few minutes the plaintiff in error left his position and went behind the store of one Whitehead, and had been there only a few minutes when he shot Putman through the window. The charge entered the side of the head, death ensuing instantly. Johnson and Scribner got on their horses and left town immediately. On this latter trip the plaintiff in error was armed with a shotgun, and witness Johnson with a Winchester rifle.

Johnson testified that plaintiff in error wore arctic shoes over his other shoes. Witness Whitehead testified that he was in his father's store the night Putman was killed, and was standing behind the counter; that Putman was standing about thirteen feet from the north end of the building, which was the rear end of the same; that there was a door in the center of the house and a window in each corner; that Putman was shot through the lower pane of the lower sash of the northeast window; that Putman was talking to Brad Haile at the time; that deceased was shot with a No. 2 buckshot in the side of the head, and died instantly. This witness testified further that he examined the ground near the northeast corner of the building; that he observed that tracks were there made by an overshoe. The checks on the overshoe made impressions on a pile of ashes. He also found that two horses had been tied to the fence near by. One horse was shod all round; the other horse had only two shoes. They followed the tracks along the direction witness Johnson testified that he and the plaintiff in error rode when they left

town.   Johnson also testified that one of the horses they had ridden was shod all round; the other one in front only.   Johnson testified that when they got back as far as Mack Lee's they fired the Winchester and set it down by the fence.   Witness Couch testified that he heard a shot fired from a Winchester or six-shooter about the time Johnson said the shot was fired. It appears that Scribner and Johnson stayed at the home of Frank Scribner on the night of the homicide; that on the way they stopped at John Scribner's and left one of the horses and the shotgun.

Witness Perriman testified that he was at John Scribner's about midnight, when these parties came there and called for John, and the next morning one of the horses was in the lot and looked as though it had been ridden some distance.

Witness Leader testified that he was at John Scribner's the night of the homicide.   John Scribner and his wife were at Ada that night.   Two persons came about 12 o'clock and called for John.   The next morning one of the horses which had been ridden by Scribner and Johnson was in the lot and looked pretty tough.   On Sunday evening following witness Perriman said he saw the other horse at Frank Scribner's.   Johnson testified they arrived at Frank Scribner's about 2 or 3 o'clock and left the other horse there.   Frank and his wife were there.   Frank and the plaintiff in error ran the clock back.   The next morning the plaintiff in error gave Frank Scribner some of the loaded shells and an empty shell which was bursted near the hull.   At this time Frank said to the plaintiff in error that his (Frank's) wife would not swear a lie about the time they arrived at his house.   Afterward it appears that witness Johnson went to Texas, and in a few days returned to Idabel, where he saw the plaintiff in error, who asked him to go to Mack Lee's and find out what was being said about the killing.   He went and Lee told him that they had him (Johnson) accused of the murder, but that he had not heard anything said about the plaintiff in error.

The plaintiff in error did not testify at the trial.   The testimony introduced in his behalf tended to fasten the crime on

Johnson and contradict his statement as to the facts as outlined in his testimony on behalf of the state.

This case has been before this court heretofore. See *Scribner v. State,* 3 Okla. Cr. 601, 108 Pac. 422, 35 L. R. A. (N. S.) 985. There is no merit in the questions raised by the appeal now before us. The only assignment that we shall discuss at all is based on an instruction given by the trial court. The instruction complained of is as follows:

"A reasonable doubt is an actual doubt that you are conscious of after going over in your minds the entire case, giving consideration to all the testimony and every part of it. If you then feel uncertain, and not fully convinced that the defendant is guilty, and believe that you are acting in a reasonable manner, and if you believe that a reasonable man, in any matter of like importance, would hesitate to act because of such a doubt as you are conscious of having, that is a reasonable doubt, of which the defendant is entitled to have the benefit."

It is contended that under the doctrine laid down in *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447, this conviction should be reversed on account of the fact that the court gave the foregoing instruction. This instruction is entirely different from the one condemned in the Price case. A casual reading of that opinion will disclose the material difference. A better instruction might have been given by the trial court, but, under the facts disclosed by the record, it would be a miscarriage of justice for this court to reverse this conviction on this ground. The instruction in the Price case required the jury to find the reason upon which to base their doubt. The instruction given by the trial court in the case at bar is sustained, in our judgment, by the case of *Holt v. United States,* 218 U. S. 245, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138.

We have carefully examined the record and briefs, and find no reason advanced by counsel sufficient to warrant the court in interfering with the judgment, and there is nothing disclosed by the record indicating that the plaintiff in error was deprived of any substantial right on the trial. In our judgment, he had a fair and impartial trial, and a judgment imposing the death penalty would not have been reversed under the state of the case

presented to us. There is no contention but that the deceased, Putman, was the victim of a most deliberate and cold-blooded assassination, and no fair-minded man could read this record and be otherwise than convinced absolutely that the fatal shot was fired by the plaintiff in error. All his rights were preserved by the trial court and nothing but fundamental error would justify this court in interfering with the enforcement of the judgment.

There is not a single material proposition that could be earnestly urged as being sufficient to warrant a reversal of this cause and the granting of a new trial. The swifter and surer the punishment meted out in this class of cases the better it is for the law-abiding citizenship of the state. Finding no error in the record sufficient to justify a reversal, the judgment of the trial court is in all things affirmed.

DOYLE and FURMAN, JJ., concur.