## WILEY M. BURNS v. STATE.

No. A-3726.   Opinion Filed April 3, 1922.
Rehearing Denied Nov. 28, 1922.
(210 Pac. 302.))

(Syllabus.)

1.   **Trial—Charge on Circumstantial Evidence not Required Where Killing Admitted.** In a murder case where the defendant admits the killing, a charge on circumstantial evidence is not required.

2.   **Trial—Better Practice not to Define Reasonable Doubt.** It is better practice for trial courts not to define the term "reasonable doubt." The term itself is reasonably well understood by jurors, and most definitions given for the term have no real tendency to enlighten its meaning.

3.   **Same—Defining Reasonable Doubt not Reversible Error.** Where the trial court defines the term "reasonable doubt" in the general charge to the jury, and the definition given is not incorrect nor misleading, no reversible error appears.

4.   **Homicide—Review—Errors Assigned in Petition in Error but not Referred to in Brief.** In a prosecution for murder, assignments of error contained in the petition in error but not referred to in the brief of appellant will be examined. In this case, after an examination of all the alleged errors assigned, the judgment is affirmed for the reason that none of the alleged errors are of a prejudicial nature such as should result in a reversal of the judgment.

Appeal from District Court, Choctaw County; G. M. Barrett, Judge.

Wiley M. Burns was convicted of murder and sentenced to imprisonment for life, and appeals.   Affirmed.

Warren & Warren, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

MATSON, J.   This is an appeal from the district court of Choctaw county, wherein on the 1st day of November, 1919, plaintiff in error, hereafter referred to as defendant, was con-

victed of the murder of one M. O. Hornbeck and sentenced to imprisonment in the penitentiary for life.

The killing occurred near the village of Fallon in Choctaw county on the evening of the 9th of September, 1919. Defendant and deceased were brothers-in-law, the widow of deceased being a sister of the defendant. Defendant was living with the deceased and his wife on a farm just north of the village of Fallon, and they were jointly engaged in raising a crop on said farm. Prior to the killing a certain difficulty had arisen between them, according to the testimony of the defendant, concerning the disposal of the corn crop and some of the live stock. The killing occurred between the hours of 8 and 9 o'clock at night. Deceased and his wife on that evening were in attendance at a religious meeting held in an arbor at the village of Fallon. According to the testimony of witnesses, it was only a few hundred yards from the place where the religious meeting was being held to the house of the deceased. Shortly after the meeting convened, the deceased was seen to leave it and depart in the directtion of his house. In a few minutes thereafter some of those at the meeting heard five shots fired apparently at or near the deceased's home. In about 30 minutes thereafter the defendant appeared at the meeting and called out the deceased's widow, and together they departed in the direction of the home of the deceased. In about 30 minutes thereafter the widow of the deceased returned to the meeting and announced to some parties there that her husband had been killed. Thereafter some of the persons attending the meeting went to the home of the deceased, and his body was found lying in the yard south of the house near a well or cistern. The deceased had been shot at least three times, twice in the upper and back part of the head on the left side, and once in the left side through the left arm, all of said bullets ranging from left to right and slightly

downward. Blood and some brains were found spattered over the platform and curbing around the well or cistern. The deceased's body was lying in an east and west direction with head to the east, and the head was about a foot and a half from the platform of the well. The body was lying on its stomach and left side of the face with the hat of deceased under the head, and only one bullet hole was found in the hat. The left arm was beneath the body and the right arm was extended from the body, and an open knife was found in the right hand of the deceased, and the lining of the right trouser's pocket of the deceased was pulled out about two inches. There was a porch extending along the entire south side of the house. This porch was higher than the surrounding ground from one to three feet and was some higher than the platform at the well. The entrance to the premises was from the west, and it was the theory of the state that the deceased had been shot from the house or from the porch of the house, either while he was at the well to get a drink or approaching the well for that purpose, and the location of the wounds and their course and other physical facts tended strongly to substantiate this theory.

The defendant admitted the killing, and his testimony as to the things that occurred at the time of the killing was substantially as follows:

Q. You are the defendant in this case? A. Yes, sir.

Q. How old are you, Mr. Burns? A. 49.

Q. I want you now in your own language to tell the jury what took place between you and the defendant on the day out there before the killing took place, out there at the house. A. Why, he told me I would have to leave home, and for me to go away.

Q. Now tell the jury how it came about that those remarks were made to you about leaving home. A. Well, he was

in the habit of going away and staying two or three weeks at a time, and he came back, and corn was ready to gather, and I asked him if he was going to help gather that corn. He said it didn't make any difference to me whether he did or not. He told me that he didn't think I would gather any crop there; that I had better get out. So, I told him I intended to take out when I got my crop gathered; he said, "You will not stay here to gather that crop." I see that I couldn't get along with him, so I come to Hugo. There was a man that I had been talking with trying to sell him my mule and crop; he was out of town, and I couldn't see him—

Q. Who was that man? A. Cash; he runs a livery barn here in Hugo. So, he was out of town and I couldn't see him. I got to studying over the matter and couldn't find this man to sell my crop to. I decided that I would go down and get my clothing, suit case, and leave the place, let them have it, have no more to do with it, not to have trouble. I saw it was impossible to stay. So, I took this night when they was supposed to be at church. I guess it was about 7 o'clock when I got back home. I was in the drawer getting clothing and fixing up my suit case to go away. I stepped to the door, and this man, Hornbeck, come up to the house through the lot. He come right up until he got into the gate, and he commenced fussing. He called me every vile name that a man could call one, and he says, "You are back here?" I says, "There is no chance to get along with you," and I decided I was going to leave the whole thing, "I am willing to lose the whole thing." He says, "You made one trip too many." He says, "You know what I told you this morning before you left." He says, "I am going to do to you just what I told you I would do," and at that he jerked his knife out of his pocket and started up on the porch for me; of course, I was scared, and I started shooting. I fired until I stopped him and he fell, and I put the gun up, went down to the church where my sister was, and told her what had happened.

Q. You say you had come to Hugo that evening, how did you go back? A. In a wagon.

Q. With whom? A. He was a nigger; I don't know what his name was.

Q. Where did you quit the wagon? A. About 40 yards west of the 'arbor. They; was holding meeting. There is an old road there. I took this old road, passed within probably 30 or 40 yards of the arbor. That is the nearest way from the main road to where I lived.

Q. Now, you may; tell that jury why you shot Ode Hornbeck. A. I shot him because I thought he was intending to kill me. He told me that he would kill me and drew a knife and started at me. I couldn't see any way out of it.

Q. How many times did you shoot? A. I don't know how many times I fired.

Q. Now, did you shoot and then wait two or three minutes longer and then fire two shots? No, sir; I didn't.

The testimony of the defendant is in conflict with that of the state's witnesses as to the interval between the third and fourth shots. All the witnesses who gave testimony for the state testified that the first three shots were fired in rapid succession, and that there was an interval of two or three minutes between the third and fourth shots, and that the fourth and fifth shots were fired in rapid succession. The location of the wounds on the body of the deceased and their course clearly indicate that the deceased could not have been coming at the defendant with a knife at the time he was shot, and the location of the body and of the places where blood and brains were found indicated that the deceased could not have been closer than from eight to twelve feet to defendant if the defendant shot him from the porch as testified to by him; and, further, the hat of the deceased was powder burned at the point of the entrance of the bullet to it, indicating that one of the shots at least that entered the head was fired at close range and from the side or rear. It was the theory of the

state that the deceased had been shot in the head probably after he fell to the ground, and that the defendant had pulled the knife out of the deceased's pocket and placed it in his right hand, and the physical facts were such as to authorize the jury to reach this conclusion. We think the evidence amply sufficient to sustain the verdict and judgment.

It is first contended that the trial court erred in refusing to give a requested instruction on the law relative to circumstantial evidence. In the case of Foster v. State, 8 Okla. Cr. 139, 126 Pac. 835, it is held:

"In a murder case, where the defendant admits the killing, or where there is direct evidence that the defendant killed the deceased, a charge on circumstantial evidence should not be given."

In view of the fact that the defendant admitted the killing in this case, an instruction on circumstantial evidence was not required. It was no error, therefore, to refuse to give a requested instruction on that subject.

Secondly, it is contended that the trial court erred in giving an instruction defining the term "reasonable doubt." It is not contended that the definition of "reasonable doubt" as given by the trial court was erroneous, but that in a case like this, where the conflict in the testimony is only by circumstances, any definition of "reasonable doubt" might mislead the jury.

This court has repeatedly said in numerous decisions that the better practice is never to define the term "reasonable doubt," that the term itself is reasonably well understood by jurors, and that most definitions given for the term have no real tendency to enlighten its meaning.

But this court is not authorized to reverse a judgment of conviction even for the giving of an erroneous instruction un-

less the same probably resulted in a miscarriage of justice. Section 6005, Rev. Laws 1910. A fortiori, the court would not be authorized to reverse a judgment of conviction for the giving of an instruction defining the term "reasonable doubt" which is not contended to be an incorrect definition of that term. The instruction given finds support in the following decisions of this court: Scribner v. State, 11 Okla. Cr. 189, 144 Pac. 626; Chandler v. State, 3 Okla. Cr. 254, 105 Pac. 375, 107 Pac. 735; McDaniel v. State, 8 Okla. Cr. 209 (219), 127 Pac. 358.

The petition in error contains other assignments of error, but the same are not supported by argument or the citation of authority in the brief of the defendant. In view of the fact that this is a conviction for murder with life imprisonment assessed as punishment therefor, the court has taken occasion to examine the record with relation to those alleged errors, and the conclusion is reached that none of the errors assigned are of a prejudicial nature such as should result in a reversal of the judgment.

The judgment of conviction is therefore affirmed.

DOYLE, P. J., and BESSEY, J., concur.