## LIPPOLDT v. STATE.
### No. A–11957.

Criminal Court of Appeals of Oklahoma.

May 19, 1954.

Rehearing Denied June 16, 1954.

Murphy & Firestone, Kingfisher, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Alfred Frederick Lippoldt, Jr., hereinafter referred to as defendant, as in the trial court, has appealed from a judgment entered by the county court of Kingfisher County where by the verdict of a jury he was found guilty of the charge of driving a motor vehicle upon a public highway while under the influence of intoxicating liquor. Defendant was assessed punishment at a fine of one dollar.

For reversal, defendant advances eight specifications of error, which are argued under four propositions.

We shall first consider the contention that the court erred in overruling defendant's motion for continuance.

We find, as stated by the Attorney General, that:

"It appears from the record that the case had been originally set for trial on the 14th day of April, 1953, and that subpoenas had been issued for state's witnesses. No subpoena had been issued on behalf of the defendant. For some reason the case was continued until the 23rd of April, and when the defendant filed his motion for continuance on April 21st he made no request for the issuance of a subpoena for any witness. The praecipe for subpoena was filed instead on the 23rd day of April, which was trial day, and subpoenas were issued and returned on that same day showing service secured on one witness. The application for continuance which had been filed on the 21st did not even begin to comply with the necessary prerequisites laid down by the repeated decisions of this court. It did not even attempt to show diligence to secure the presence of the witnesses. It did not name the witnesses. It did not show any prospect of securing their attendance if there were a continuance."

This court has many times said that as to whether a motion for a continuance should be granted is generally within the sound discretion of the trial court, and where this discretion has not been abused, the case will not be reversed, and that where the defendant has failed to use diligence as required by statute, 12 O.S.1951 § 668, in procuring the attendance of a witness, the action of the trial court in refusing a continuance will not be set aside on appeal. See Foster v. State, 79 Okl.Cr. 183, 152 P.2d 929; Baum v. State, Okl.Cr., 239 P.2d 446; and Byars v. State, Okl.Cr., 248 P.2d 643.

It is next asserted that the court erred in not sustaining the defendant's demurrer to the State's evidence, and that the verdict and judgment of the court is not supported by the evidence.

Ted Payne, trooper with the Oklahoma Highway Patrol, testified that on the 7th day of December, 1952, at about ten o'clock in the evening he arrested the defendant and advised him that the arrest was for drunk driving. The witness stated:

"We were traveling north on 81 about a little over a mile or possibly more, north of Okarche and we noticed two cars in front of us, and the front car was weaving back and forth across the roadway, and we pulled up closer to the second car which passed the first car and went on its way. We fell in behind the car in question then and followed it for about a half mile, I guess, something like that, and it was weaving back and forth on the roadway badly, so I was driving, and I pulled up beside the automobile and turned my red light on and honked the horn, and about the time I pulled up beside it and turned on the red light and honked the horn, there was a county road right about there which this car turned to the right on, and then came to a stop, after I pulled up possibly two car lengths on the county road. After pulling the patrol car in behind this other car I had Mr. Reed stand directly behind the automobile in question. When Trooper Reed and me got of the car, I went up on the driver's side and explained to the defendant that I wanted his driver's

license and asked him to step out of the car, which he did. We conversed with him for some three, four, or five minutes at the most, and placed him under arrest, and in the patrol car."

Officer Payne further testified:

"Q. From your observation of the defendant, before his arrest, immediately prior up to and including the time you placed him under arrest, was he in your judgment operating a motor vehicle while under the influence of intoxicating liquor? A. Definitely.

"Q. As defined by law? A. Definitely."

On cross-examination by Mr. Murphy, defendant's counsel, witness was asked if the defendant did not tell the officers that he was trying to decide whether or not to go on to his father's house that evening, or to go on to his own home, because he had to be back at the hospital the next morning, and was trying to locate the corner where to turn off, and witness answered: "No, sir." He was then admonished:

"Q. I want you to tell the court and jury then everything that was said between you and Mr. Lippoldt and Mr. Reed. A. He said that he lived down there and was going home.

"Q. Lived down where? A. Down the road he pulled off on, and that he was going home and had been to the hospital to see his wife who was seriously ill in the hospital, and I asked him if they let him in the hospital in the condition he was in, and he said, 'No, I got in this condition after I left the hospital'. I said, 'How far do you live down this road?' and he said, 'about half a mile or two east, and a little north', and I said, 'How long have you lived there?' and he said, 'practically all my life.' We talked on a little bit and he says, 'My father lives there, and I live close to Hennessey. I don't actually live there, my father lives there.' So then I arrested him, placed him in the car and came to town."

On re-direct examination witness further testified:

"Q. If you would state for the court and jury, there was some cross-examination here about the anxiety of the defendant. What was his anxiety displayed to you? A. The fact that he was being arrested.

"Q. What was it he said to you? A. Well, he wanted to know if I couldn't turn him loose, and he wanted to know if we wouldn't take his car, bring it up here and park it so he wouldn't be driving it and then take him in the patrol car on to his home, and he would pick it up the next day."

B. W. Reed, trooper for the Highway Patrol, testified that he was the officer riding with officer Payne the night of the 7th December when the defendant Lippoldt was arrested for drunk driving. His testimony as to the facts of the arrest was substantially the same as that of officer Payne. On cross-examination witness stated that he was within three or four feet of defendant after he was placed under arrest and that he could smell liquor on his breath. Witness was asked:

"Did you imagine all that weaving was because he was intoxicated? A. I didn't imagine anything, I figured it was a major factor in the weaving."

This officer further testified that he was the person who placed the defendant in jail, and to the question, "At the time you locked him up what was his conduct, demeanor, attitude and appearance when you talked to him, was it that of a sober man?" He answered, "No, sir."

The cross-examination of each of the two officers was quite lengthy, brought out the fact that the defendant had no teeth and naturally talked with a thick accent, and brought out the fact that the defendant was not given a blood test, or breath test known as "drunkometer" test, to determine the amount of alcohol in his system.

Counsel demurred to the above evidence and the court overruled the demurrer. It is determined that the evidence was sufficient for submission of the question of defendant's intoxication to the jury.

The defendant testified and several witnesses testified in his behalf.

Bill Krause testified that he had lived at Okarche practically all his life, had farmed but was working at Eischen's Cafe on December 7, 1952 or the night the defendant was arrested; that defendant came to the cafe about seven o'clock or a little later, and that he was sober. Defendant stayed until a little after nine o'clock and while there he played a few hands of cards and drank a beer or two. Witness stated that defendant ate a sandwich and that he did not observe any action or conduct on the part of defendant indicative of drunkenness.

Defendant testified that he was 38 years old, married and the father of five children; that he worked at odd jobs; that he owned an automobile necessary for him to get to and from work; that he worked on farms, did carpentry work or anything; that on the 7th day of December, 1952 he got up and performed chores and then went to church, then went home, then to his father's and had dinner and afterwards along about three o'clock went to the hospital to see his wife who was there with a premature baby, and that she was very sick; that along about six thirty or seven a nurse told him that he would have to leave as they were going to rub his wife's back. He then advised his wife that he would go get something to eat, and went to Eischen's Cafe in Okarche and while there joined in a card game and stayed longer than he planned; that he got up and ate a beef sandwich and drank a glass of beer, and found out that it was after nine, so he left for the hospital, but on getting there was told by the nurse that his wife was asleep, so he told the nurse that he would return the next morning.

Defendant testified that he drank but two bottles of beer while at the cafe; that when he left the cafe he got in his car and backed it away from the curb and went north to the Catholic Church, went a block west, then to the hospital; that it is hard to back out of the highway after you leave the hospital, where you drive north from the hospital, and have to weave short to make it, but that he had no difficulty; that he started home and got one and a half miles from town and reached where the road corner was to go to the home of his parents. He was not accustomed to finding the corner coming from Okarche and it was hard to find at night, but if he had been approaching from the other direction it would have been easier. He testified that he was trying to make up his mind whether to go to the home of his father, or to go on to his own home. He had to be back at the hospital by seven o'clock the next morning, and he figured it would be closer to go to his father's; that he stopped his car and was sitting there trying to decide what to do. He stated that he knew there was a car following but did not know it was a patrol car, but when he discovered it was a patrol car he sat there wondering what he had done; he was scared. He said that he did not see the red light until after he had stopped. His motor was still running until the patrolman asked for his driver's license. He then stepped out of the car, got his billfold and found the license and gave it to the officer; that he did not have much trouble getting the billfold; that it was dark, but the officers had flash lights; that they told him that he was drunk, which he denied, telling them he had consumed only two beers, but they ordered him into the patrol car; that he told them about his wife and baby being in the hospital. He further stated that when he got out of his car he leaned up against it and the patrolman walked up and said, "Why are you leaning against the car?" and he told him he could walk, and walked out a ways; that he got in the patrol car and one of the officers took his car; that he had $13 or thereabouts and they took that and his cigarettes and he finally got his cigarettes back, but didn't get his money back; that he did not have his teeth, having had them pulled; that he was considered red-complexioned.

On cross-examination defendant admitted that on January 18, 1949 he had plead guilty in the county court of Kingfisher County to a charge of operating a motor vehicle on a public road while under the influence of intoxicating liquor, and had paid a fine of $100 and costs; and he further admitted that the money he had that was taken by the officers was applied on a fine he had been assessed

in a justice of peace court where he had plead guilty to fighting with an Indian.

Defendant's wife, Margaret Lippoldt, called as a witness, testified that she and defendant had been married thirteen years; that they had five children; that she was in the hospital when the defendant was arrested; that he was sober when he left the hospital a few hours prior to his arrest.

Thus the evidence ended; the defendant renewed his demurrer, which the court overruled, and properly so. See Hunt v. State, 81 Okl.Cr. 114, 161 P.2d 82; Taylor v. State, Okl.Cr., 240 P.2d 803; Moran v. State, Okl.Cr., 237 P.2d 920; Rothrock v. State, 90 Okl.Cr. 251, 213 P.2d 291.

But it is further asserted by the defendant that the case should be reversed in that incompetent, irrelevant and immaterial evidence was admitted. This contention is based on the admission of evidence by the State to show the condition and physical layout of the highway travelled by the defendant from the point where the officers first observed defendant to the point of his arrest. The officer was asked by the county attorney about points where road markers were located, and about no-passing zones, over objection of counsel for the defendant. We have examined the evidence complained of very carefully and fail to find where the testimony in question could have benefitted the State or prejudiced the defendant in any way.

It is further asserted that the court erred in instructing the jury as to the issues in said case, and in refusing to give special instructions submitted by the plaintiff in error. We have examined the requested instructions and the instructions actually given, and find that the instructions given fairly advised the jury of the issues for their determination, and the law applicable; except that in the closing paragraph of Instruction No. 1, the court gave a short definition of "reasonable doubt". As pointed out by defendant, this court has many times held that the trial courts should not attempt to define "reasonable doubt". We went into some detail and cited basic cases in Moore v. State, 90 Okl.Cr. 415, 214 P.2d 966.

The last paragraph of Instruction No. 1 reads:

"The term 'reasonable doubt' is, perhaps as well understood as any legal description of it could be. It simply means that the evidence should be of such a nature as would control and decide the conduct of any reasonable person in the most important affairs of life, and not a mere conjecture, a trivial supposition or a bare possibility of the guilt of the defendant."

In the Moore case, supra, 90 Okl.Cr. on page 420, 214 P.2d on page 969, we said:

"A review of the authorities discloses that there have been a number of cases where this court gave an instruction covering reasonable doubt, and where the case was not reversed for that reason. In a number of instances this court approved the actual instruction defining reasonable doubt. See opinions by Judges Owen, Furman, Armstrong and Matson, respectively, and being: Chandler v. State, 3 Okl.Cr. 254, 105 P. 375, 107 P. 735; McDaniel v. State, 8 Okl.Cr. 209, 127 P. 358; Scribner v. State, 11 Okl.Cr. 189, 144 P. 626, and Burns v. State, supra [22 Okl.Cr. 151, 210 P. 302]."

An examination of the authorities will disclose that the language quoted from Instruction No. 1 is not the language contained in instructions that were held to have gone so far afield as to without more cause a reversal of the convictions. However, in the instant case, if the evidence had been less positive and if the defendant had had a clean record of previous conviction for drunk driving, such instruction would possibly have caused a reversal. A court in giving such instruction risks such chance.

But by reason of what has been said, the judgment of the county court of Kingfisher County must be, and the same hereby is, affirmed.

JONES and BRETT, JJ., concur.